**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| SARA POLSTON,<br><br>Plaintiff,<br><br>v.<br><br>JUSTIN FARRIS, in his official capacity as Director of the Oklahoma Department of Corrections,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. __________ |

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Sara Polston brings this complaint for declaratory and injunctive relief against Justin Farris in his official capacity as Director of the Oklahoma Department of Corrections. Defendant seeks to reincarcerate Plaintiff by retroactively applying a new state law to her without notice or an opportunity to be heard, in violation of the Ex Post Facto, Bill of Attainder, and Due Process Clauses of the U.S. Constitution. Defendant's imminent enforcement of Oklahoma's new law against Plaintiff violates those most fundamental constitutional principles and should be enjoined. *See* THE FEDERALIST NO. 44, at 282 (James Madison) (C. Rossiter ed., 1961) ("Bills of attainder [and] ex-post-facto laws, . . . are contrary to the first principles of the social compact and to every principle of sound legislation.").

## PRELIMINARY STATEMENT

1. On February 7, 2023, Plaintiff Sara Polston made a gross and criminal error of judgment. She drank an excessive amount of alcohol and then got behind the wheel of a car. She drove recklessly and much too fast.

2. Ms. Polston drove through a stop sign and crashed into the vehicle of Micaela Borrego, an innocent young woman who will forever be affected by Sara's tragic mistake. Ms. Borrego suffered a traumatic brain injury and is still recovering from the harm caused by Ms. Polston.

3. Accepting responsibility for her crime, Ms. Polston pleaded guilty to the single felony with which she was charged: Causing an Accident Resulting in Great Bodily Injury While Driving Under the Influence of Alcohol with Blood Alcohol Content of 0.15 or Higher, in violation of 47 O.S. § 11-904(B) ("DUI-GBI"), in Cleveland County Case No. CF-2023-973.

4. The court imposed on Ms. Polston a fifteen-year sentence with the first eight years to be served in the custody of the Department of Corrections. *State v. Polston*, No. CF-2023-973 (Cleveland Cnty. D. Ct. Dec. 8, 2025). Ms. Polston accepted this sentence and did not appeal.

5. Ms. Polston is committed to rehabilitation. She has undergone treatment, maintained sobriety, and served continually in her community. Even before sentencing, she progressed from attending Alcoholics Anonymous ("AA") meetings to leading them and mentoring others in recovery. While incarcerated, Ms. Polston took full advantage of the treatment and substance-abuse rehabilitation programs that were available to her. She has volunteered at Food & Shelter and other community services. Aside from the time Ms. Polston was imprisoned, she has continued to devote herself to serving others.

6. At the time Ms. Polston committed her crime, Oklahoma had enacted and implemented the Electronic Monitoring Program (the "Program"), which allows for certain convicted individuals to be supervised in a community setting rather than being confined in prison. 57 O.S. 2021 § 510.9.

7. When Ms. Polston pled guilty and was convicted, sentenced, and processed, she met the statutory criteria for participation in the Program.

8. During her intake and processing, the Department of Corrections found that Ms. Polston was eligible to participate in the Program. On February 19, 2026, the Department of Corrections formally assigned Ms. Polston to the Program.

9. Oklahoma law requires that "[e]very eligible inmate assigned to the Electronic Monitoring Program shall remain in such program until one of the [three specified] conditions has been met": discharge of the term of her sentence, parole by the Governor, or violation of any rule or condition of the program. 57 O.S. 2021 § 510.9(C). So, unless and until a condition in 57 O.S. 2021 § 510.9(C) has been met, she is under law entitled to remain in the Program.

10. Ms. Polston remains in the Program to this day and has fully complied with all its rules and conditions, as well as with the Inmate GPS Orientation Guidelines and Procedures and with all instructions given to her by her supervising officer. Thus, Oklahoma law both now and when the crime occurred requires that, until one of the conditions in section 510.9(C) occurs, Ms. Polston "shall" serve the remainder of her sentence in a community setting with active supervision on a GPS monitor and associated reporting and programming rules—not incarcerated in a prison.

11. This result angered the Oklahoma Legislature and other elected officials, despite this outcome being consistent with the laws the Legislature itself enacted. The Legislature enacted Senate Bill 137 ("SB137") to require that "[a]nyone who causes great bodily harm to another due to their decision to drive under the influence should be held accountable for their actions and serve their entire sentence behind bars." Press Release: "Senate Approves Hamilton Bill Preventing DUI Offenders' Participation in Electronic Monitoring Program," Okla. Senate (Mar. 25, 2026) ("Hamilton Press Release") (emphasis added).[1]

12. SB137 was enacted into law on May 5, 2026, and it changes the Electronic Monitoring Program under 57 O.S. 2021 § 510.9 in two ways:

a. It amends subsection 14 to section B to make those convicted for DUI-GBI under 47 O.S. § 11-904 (the offense for which Ms. Polston was convicted) ineligible for the Program;

– and –

b. It adds a provision in section D that states: "Loss of eligibility for the program shall result in removal of the inmate from the program."

*See* Act Relating to the Department of Corrections, 2026 Okla. Sess. Law Serv. ch. 157 ("SB137"), amending 57 O.S. § 510.9(B) and (D).

13. Oklahoma officials have credibly threatened that SB137 will be retroactively enforced against Ms. Polston to automatically remove her from the Program and send her back to prison. But that flies in the face of multiple provisions of the United States Constitution and runs "contrary to the first

[1] Press Release, Oklahoma Senate, *Senate Approves Hamilton Bill Preventing DUI Offenders' Participation in Electronic Monitoring Program* (Mar. 25, 2026), https://perma.cc/5ZKB-QK27.

principles of the social compact and to every principle of sound legislation." *See* THE FEDERALIST NO. 44, at 282 (Madison); *see also* U.S. Const. art. 1, § 10, cl. 1; *id.* amend. XIV. Ms. Polston therefore brings this action to enjoin any retroactive enforcement of SB137 against her and to obtain a declaration that any retroactive application of SB137 to remove Ms. Polston from the Program and reincarcerate her is unconstitutional.

14. First, applying SB137 retroactively to remove Ms. Polston from the Program and put her back in prison violates the Constitution's Ex Post Facto Clause because it increases her punishment based on a law that was enacted after she committed the crime. *See In re Medley*, 134 U.S. 160, 171–73 (1890) (invalidating a Colorado law changing death row inmates' condition of confinement to solitary confinement as applied to inmates whose "crimes [were] committed before [the Colorado law] came into force" because change to solitary confinement "was an additional punishment . . . and [wa]s therefore forbidden by" the Ex Post Facto Clause); *Weaver v. Graham*, 450 U.S. 24, 30–31 (1981) (invalidating Florida law that curtailed inmates' ability to obtain credits against their sentences for good conduct, effectively postponing inmates' eligibility for early release, because "even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the [Ex Post Facto] Clause if it is both retrospective and more onerous than the law in effect on the date of the offense"); *Lynce v. Mathis*, 519 U.S. 433, 436 (1997) (holding that law that "retroactively canceled all provisional [good-time] credits awarded to inmates convicted of" specific crimes was an unconstitutional ex post facto law as applied to prisoner that had been released but was reincarcerated under new law).

15. Second, SB137 violates the Constitution's Bill of Attainder Clause because the law specifically targets Ms. Polston and under it the State seeks to impose additional punishment—namely, removing her from the Program and returning her to prison—without requiring a trial before imposition of that additional punishment. *See United States v. Brown*, 381 U.S. 437, 447 (1965) ("[L]egislative punishment, of any form or severity, of specifically designated persons or groups" is prohibited by the Bill of Attainder Clause); *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 474 (1977) (explaining that imprisonment is one form of punishment barred by the Bill of Attainder Clause); *Reynolds v. Quiros*, 990 F.3d 286, 296-98 (2d Cir. 2021) (explaining that a law was "plainly punitive" because it directed "the Commissioner of Correction to house special circumstances inmates in administrative segregation, which is Connecticut's most restrictive form of incarceration"); *Bledsoe v. United States*, 384 F.3d 1232, 1238 (10th Cir. 2004) ("[A] bill of attainder legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." (citation omitted)).

16. Third, Defendant's credible threat of reimprisoning Ms. Polston violates the Constitution's Due Process Clause because her automatic removal from the Program—which, under Oklahoma law, grants Ms. Polston protected liberty interests—is without notice, an opportunity to be heard, and any of the procedural protections provided for by Oklahoma rules and regulations and required by the U.S. Constitution. *See Young v. Harper*, 520 U.S. 143, 147-48 (1997) (holding that Oklahoma violated an individual's due process rights when it automatically removed him from a community supervision program without an individualized

hearing that complied with the procedures commanded by *Morrissey v. Brewer*, 408 U.S. 471 (1972)); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (explaining that where "the State itself has not only provided a statutory right to" a program benefitting an inmate "but also specifies that it is to be forfeited only for serious misbehavior . . . . the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.").

## PARTIES

17. Plaintiff Sara Polston is an Oklahoma citizen and resident of Norman, Oklahoma.

18. Ms. Polston was convicted under 47 O.S. § 11-904(B) ("DUI-GBI"). At this time, she is in the Electronic Monitoring Program through active supervision in a community setting until she discharges the eight year term for which she is in Department of Corrections custody or is paroled.

19. Defendant Justin Farris is sued in his official capacity as the Director of the Oklahoma Department of Corrections, pursuant to *Ex parte Young*, 209 U.S. 123 (1908).

20. As Director of the Department of Corrections, Defendant Farris is "the executive officer" charged with the "general powers and duties" to "act for the Department in all matters." 57 O.S. § 507. Oklahoma law specifically charges Director Farris with the authority to implement the Program. *See* 57 O.S. § 510.9(A) ("The Department is authorized to use an electronic monitoring global positioning device to satisfy its custody duties and responsibilities."); *id.* § 510.9(B) ("After an

inmate has been processed and received through a Department Assessment and Reception Center . . . , the Director of the Department of Corrections may assign the inmate, if eligible, to the Electronic Monitoring Program.").

21. Defendant Farris is therefore the state official specifically charged with the duty to enforce SB137's amendments to the Electronic Monitoring Program.

## JURISDICTION AND VENUE

22. Plaintiff's federal causes of action arise under 42 U.S.C. § 1983 and the United States Constitution. This Court thus has jurisdiction under 28 U.S.C. § 1331.

23. The Court has authority under § 1983 and *Ex parte Young* to enjoin enforcement of SB137 and to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

24. SB137 was enacted in this district and there is a credible threat Defendant Farris, in the performance of his official duties, will enforce it retroactively to summarily remove Plaintiff from the Program in this district. Venue is thus proper in this district because a substantial part of the events giving rise to this action have occurred and will occur here. 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

### A. Ms. Polston met all eligibility requirements and criteria for placement on the Electronic Monitoring Program as of February 19, 2026.

25. The Oklahoma Legislature created the Electronic Monitoring Program in 1993 for "inmates in the custody of the Department of Corrections who are sentenced for a nonviolent offense." *See* 1993 Okla. Sess. Laws ch. 276, § 5 (creating 57 O.S. § 510.9).

26. Since then, the Oklahoma Legislature has reaffirmed and expanded the Program. Most recently, in 2021, the Oklahoma Legislature expanded eligibility to

persons serving terms of imprisonment of up to 10 years. *See* 2021 Okla. Sess. Laws ch. 417, § 1 (amending 57 O.S. § 510.9(B)(1)).

27. The law as amended in 2021 authorized the Department of Corrections "to use an electronic monitoring global positioning device to satisfy its custody duties and responsibilities" for eligible inmates. 57 O.S. 2021 § 510.9(A).

28. The statute set minimum requirements for eligibility for the Program, including that an inmate:

a. be convicted of a nonviolent offense, § 510.9(A);
b. have been "processed and received through a Department Assessment and Reception Center," *id.* § 510.9(B);
c. have a "home offer," *id.*;
d. otherwise meet the criteria for community corrections placement, *id.* (citing 57 O.S. § 521(C)), including having only "nonassaultive institutional records" and being "convicted of only previous and current nonviolent offenses," *id.* § 521(C);
e. not be serving a sentence of more than ten years with 1,095 days or more remaining, *id.* § 510.9(B)(1); and
f. not be convicted of one of fourteen enumerated ineligible offenses, *id.* § 510.9(B)(2–15).

29. On February 7, 2023, Ms. Polston committed the offense of DUI-GBI.

30. On October 1, 2025, Ms. Polston entered a plea of guilty to DUI-GBI.

31. On December 5, 2025, the District Court for Cleveland County accepted Ms. Polston's plea, finding her guilty of DUI-GBI, and imposed a fifteen-year sentence with the first eight years to be served in the custody of the Department of

Corrections, with the remaining seven years of her sentence being suspended. *State v. Polston*, No. CF-2023-973 (Cleveland Cnty. D. Ct. Dec. 8, 2025).

32. Upon sentencing, Ms. Polston was committed to the custody of the Department of Corrections. After processing and admission at Mable Bassett Correctional Facility, Ms. Polston was confined at Dr. Eddie Warrior Correctional Center.

33. As the statute existed at the time of her crime, plea, conviction, sentencing, and entry into the Program, Ms. Polston was eligible to participate in the Program. 57 O.S. 2021 § 510.9(B).

34. At the time of her entry into the Program, Ms. Polston was a first-time, nonviolent offender, amenable to treatment, and had both a home offer and a clear institutional record. She met all requirements under § 510.9 and applicable Department of Corrections policy.

35. At the time of her entry into the Program, Ms. Polston met all the statutory requirements for being eligible for the Program.

36. At the time of her entry into the Program, Ms. Polston also met additional requirements set by Department of Corrections' policy: She had served over 30 days in her current incarceration and she did not meet any of the disqualifying criteria. Exhibit 1, Electronic Monitoring Program/Global Position Satellite Surveillance (GPS) Program, Okla. Dep't of Corrs. ("EMP Policy"), OP-061001, at §§ (I)(A) & (B) (eff. Sept. 16, 2024).[2]

37. Per Department of Corrections policy, "[i]nmates that meet the above criteria and that are eligible for EMP/GPS placement in accordance with 'Lower

---

[2] https://perma.cc/7WU2-NHHZ.

Security Eligibility by Crime and Time' (OP-060204, Attachment C) *will* have a parole/release plan submitted in [the Inmate and Community Offender Network (ICON)]." *Id.* at § (I)(B) (emphasis added).

38. Ms. Polston met all these criteria and thus had a parole/release plan submitted in ICON.

39. In a public statement, the Department of Corrections described the process of Ms. Polston's approval as follows:

> Sara Polston was received on Dec. 8, 2025, and assessed by her case manager on Dec. 11. It was determined that, because of her conviction (47 § 11-904), lack of disqualifying criteria, no prior criminal record, and successful history of treatment and community services, she would be eligible for the GPS program. The Population and Classification unit approved the placement on Feb. 11. She is scheduled for GPS placement on Feb. 19. ODOC follows protocol, policy and state statutes in all case management assessments, and Polston's placement was approved according to those requirements.

Mecca Thompson, "Norman mother convicted of drunk driving to be released from prison," Yahoo!News (Feb. 16, 2026).[3]

**B. Ms. Polston is assigned to the Program.**

40. Having satisfied all necessary prerequisites and been approved for the Program, Ms. Polston was assigned to community custody on a GPS ankle monitor on February 19, 2026.

[3] Mecca Thompson, *Norman Mother Convicted of Drunk Driving to Be Released from Prison*, Yahoo!News (Feb. 16, 2026), https://perma.cc/8XHH-GCT6.

41. The statute, as it existed when Ms. Polston committed her crime, pled guilty, was sentenced, and was assigned to the Program, conferred on her a legal right to remain in the Program unless specific conditions were met:

> (C) Every eligible inmate assigned to the Electronic Monitoring Program *shall remain in such program* until one of the following conditions has been met:
>
> 1. The inmate discharges the term of the sentence;
>
> 2. The inmate is removed from the Electronic Monitoring Program for violation of any rule or condition of the program and reassigned to imprisonment in a correctional facility; or
>
> 3. The inmate is paroled by the Governor pursuant to Section 332.7 of this title.

57 O.S. 2021 § 510.9(C) (emphasis added).

42. The statute also stated that even if she is later denied parole, that denial "shall not be cause for removal from the program," and Ms. Polston may still "remain assigned to the program, if otherwise eligible, until the completion of the sentence." *Id.* § 510.9(D) (2021).

43. A person in the Program that escapes from the Program is subject to prosecution under 21 O.S. § 443. *See* 57 O.S. 2021 § 510.9(E).

44. Under the Program, Ms. Polston is subject to certain rules and conditions. Ms. Polston's supervising officer makes a house visit once per month, and Ms. Polston reports to the probation office once a month for a urine analysis. But she is not in prison.

45. If a person in the Program "violates any rule or condition of the program, the Department may take necessary disciplinary action consistent with the rules

established pursuant to this section including reassignment to a higher level of security or removing [her] from the program with reassignment to imprisonment in a correctional facility." *Id.*; *see* Exhibit 2, Specialized Programs Case Mgmt., Okla. Dep't of Corrs., OP-161001 (eff. Jan. 13, 2026) (establishing rules and conditions that apply to the GPS monitoring program);[4] *see also* Exhibit 1, EMP Policy, *supra* ¶ 36, at (II) (providing that supervision under the Program is governed by the Specialized Programs Case Management policy).

46. Ms. Polston has complied and is complying with all the requirements of the Program.

47. Under the Program, Ms. Polston "has been released from institutional life into society." *Harper v. Young*, 64 F.3d 563, 566 (10th Cir. 1995), *aff'd sub nom. Young v. Harper*, 520 U.S. 143 (1997) (quoting *Edwards v. Lockhart*, 908 F.2d 299, 302 (8th Cir. 1990)).

48. Ms. Polston has "the freedom to 'be gainfully employed,' 'to be with family and friends,' and 'to form the other enduring attachments of normal life.'" *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)).

49. Ms. Polston has the "ability to reside in a home of [her] own, without bars or fences or bonds, beyond the immediate authority of guards or wardens." *Id.* She lives at home with her family, she sleeps in her own bed, she can make breakfast for her kids before school and pack their lunches, she can attend their programs at school, and she can watch their sporting events and dance recitals. She can work in the community. She can attend church with her family and receive spiritual counsel. She has jumped right back in with the AA group that she has

[4] https://perma.cc/U3GQ-QRKM.

attended since 2023. She again volunteers at a homeless shelter where she has served for years.

50. In short, under the Program, Ms. Polston is free to "enjoy the benefits and joys of gainful employment, the company of family and friends, and the pursuits of humdrum existence." *Id*. at 567.

**C. Politicians react to Ms. Polston's participation in the Program.**

51. Ms. Polston's assignment to the Program quickly made the news. Even before her transfer, a local news agency published a story reporting her upcoming release and quoting the Cleveland County District Attorney's criticism of it. *See* Thompson, *supra* ¶ 39 (published Feb. 16, 2026). The Cleveland County District Attorney was quoted as saying: "We anticipated that she would be in custody for 24 months, which would be the quarter that she is required to serve by law until she is eligible for parole." *Id.*

52. On the day of her placement, another news agency also ran a story quoting the Cleveland County District Attorney, whose office had prosecuted Ms. Polston, in which that official called on the legislature to change the law to close this "loophole." Lisa Monahan, "Norman Woman Convicted in 2023 DUI Case Released Early Due to State Law," News9 (Feb. 19, 2026).[5]

53. Days later, an Oklahoma legislator introduced a bill to amend the statute creating the Program. *See* SB137, Committee Substitute (Feb. 24, 2026). He proposed two changes: making DUI-GBI an ineligible offense and providing that

[5] Lisa Monahan, *Norman Woman Convicted in 2023 DUI Case Released Early Due to State Law*, News9 (Feb. 19, 2026), https://perma.cc/LZ37-RZWT.

"[l]oss of eligibility for the program shall result in removal of the inmate from the Program." *See id.*

54. The bill was introduced at the Senate Public Safety Committee on February 24, 2026. A live recording of the Committee Hearing captures the bill sponsor's remarks and is incorporated into this complaint by reference.[6]

55. At the hearing, Senator Warren Hamilton introduced the bill by saying "Senate Bill SB137 addresses a situation that is—uh—an unfortunate and tragic drunk driving accident." Pub. Safety Comm. Hr'g, at 9:28:36–9:28:47 a.m. He added that the situation had "recently came to light" and then described the circumstances surrounding Ms. Polston's crime, her conviction for DUI-GBI, her sentence, and her subsequent placement on the Program. *Id.* at 9:29:00–9:29:51 a.m. He criticized Ms. Polston's release and placement in the Program, saying the "defendant was released from the penitentiary and put on the electronic monitoring program, which allowed this defendant to be, for lack of a better word, free via—via an ankle bracelet after 73 days in custody." *Id.* at 9:29:33–9:29:51 a.m.

56. "This unfortunate situation," he continued, "has brought to light a hole in our laws." *Id.* at 9:29:52–9:29:57 a.m. He argued that SB137 would fix this situation and would reflect "the will of the people as expressed through the sentencing of the judge." *Id.* at 9:30:26–9:30:41 a.m.

---

[6] The recording of the debate on SB137 at the February 24, 2026 Public Safety Committee Hearing is available at: https://tinyurl.com/y37pbhrk (time stamps 9:28:24 a.m. through 9:36:45 a.m.). The full hearing can be found at https://oksenate.gov/live-chamber [archived at https://perma.cc/5W28-DQPW] by navigating to February 24, 2026, and selecting the Public Safety Committee Hearing.

57. SB137 passed unanimously out of committee and was sent to the full Senate. *Id.* at 9:36:44–9:36:50 a.m.

58. It passed both houses of the Oklahoma Legislature, then became law on May 5, 2026, with an effective date of November 1, 2026. Act Relating to the Department of Corrections, 2026 Okla. Sess. Law Serv. ch. 157 (SB137), amending 57 O.S. 2021 § 510.9.

59. In a press release applauding SB137's passage, Senator Hamilton stated: "Anyone who causes great bodily harm to another due to their decision to drive under the influence should be held accountable for their actions *and serve their entire sentence behind bars*." Hamilton Press Release, *supra* ¶ 12 (emphasis added).

60. He added that "By removing this crime from the list of those eligible to be released with electronic monitoring, we are ensuring that those who commit reckless and life-altering acts face consequences proportionate to the harm they have caused." *Id.*

61. Senator Hamilton again made clear that he was targeting Ms. Polston when he introduced this bill: "[T]he impetus of the bill was a prior situation in which the perpetrator in a tragic drunk driving accident was released through the electronic monitoring program after only serving a minuscule portion of their sentence." *Id.*

62. Attorney General Drummond was reported as praising the passage of SB137: "Any drunk driver who severely injures an innocent person should face consequences that fit the gravity of their crime." *See* Mario Gonzalez, "Oklahoma

Senate approves bill barring Electronic Monitoring for dangerous DUI offenders," KFOR (Mar. 26, 2026) (quoting Attorney General Drummond).[7]

**D. Oklahoma officials threaten to retroactively apply SB137 against Ms. Polston to remove her from the Program and incarcerate her.**

63. Upon its enactment, Senator Hamilton stated his interpretation of SB137, which is that it "removes such offenses from program eligibility" and "specifies that inmates in Department of Corrections custody who lose eligibility to participate in the Electronic Monitoring Program *shall be removed from the program entirely*." Hamilton Press Release, *supra* ¶ 12 (emphasis added).

64. Meanwhile, as SB137 was proceeding through the State Capitol, Oklahoma Attorney General Gentner Drummond empaneled a Multicounty Grand Jury to investigate DOC's assignment of Ms. Polston to the Program.

65. On May 7, 2026, the grand jury issued a final report finding no evidence that any crime or willful misconduct had been committed by any public officer when Ms. Polston was assigned to the Program. *See In re Multicounty Grand Jury*, at 1, Case No. SCAD-2024-83, D.C. No. GJ-2024-3 (May 7, 2026) ("MCGJ Report").[8]

66. Upon information and belief, this report was drafted and edited by the Attorney General's Office before being voted on by the grand jury.

67. The MCGJ Report acknowledged that Ms. Polston was eligible to participate in the Program. *See id.* at 10.

68. The MCGJ Report nonetheless criticized Director Farris's failure to override the decision to assign Ms. Polston to the Program, claiming he had

[7] Mario Gonzalez, *Oklahoma Senate Approves Bill Barring Electronic Monitoring for Dangerous DUI Offenders*, KFOR (Mar. 26, 2026), https://perma.cc/TPK8-BFY2.
[8] https://perma.cc/ZC65-SQJU.

discretion to do so. *See id.* ("Despite Sara Polston's statutory eligibility, her release on GPS was still *entirely* subject to DOC discretion, was *not* mandatory, and did *not* and should not have occurred in 73 days." (emphasis in original)).

69. The MCGJ made various policy recommendations to restrict and regulate the approval process for the Program. *See id.* at 15–16.

70. After "commend[ing] the Legislature on the passing of Senate Bill 137," the MCGJ Report recommended: "DOC should amend its policies requiring any inmate currently sentenced for [DUI–GBI] on the GPS Program,"—*i.e.*, Ms. Polston—"to be immediately returned to traditional DOC custody." *Id.* at 15–16.

71. When asked for comment on the then-pending SB137, the Department of Corrections stated that it "complies with all state laws enacted by lawmakers." *See* Tanner DeLeon, "Bill aims to tackle loophole in a state law," KFOR (Feb. 25, 2026).[9]

72. Director Farris has faced significant pressure from Attorney General Drummond to bring Ms. Polston back to prison. The Attorney General haled Director Farris before a Multi-County Grand Jury, raising the specter of criminal investigation into Director Farris's approval of Ms. Polston's transfer to the Program. *See* MCGJ Report, at 10; *see., e.g.*, 22 O.S. § 353(B)(3), (6), (11); 21 O.S. §§ 580–81 (making the willful neglect or omission of a public official's duty a misdemeanor).

73. Despite Ms. Polston's conceded eligibility for the Program at the time of her crime, plea, sentencing, and Program placement, she now faces retroactively

[9] Tanner DeLeon, *Bill aims to tackle loophole in a state Law*, KFOR (Feb. 25, 2026), https://perma.cc/ZW64-VY4G.

increased punishment by Defendant by being removed from the Program to be incarcerated in prison without any notice or opportunity to be heard.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

## (DECLARATORY & INJUNCTIVE RELIEF— VIOLATION OF THE EX POST FACTO CLAUSE, U.S. CONST. ART. I, § 10, CL. 1)

74. Plaintiff incorporates by reference the above allegations.

75. This claim is brought under 42 U.S.C. § 1983, 28 U.S.C. § 2201, and *Ex parte Young*, 209 U.S. at 157.

76. As shown above, Defendant, with encouragement from state legislators and the Attorney General, seeks to enforce SB137 retroactively against Ms. Polston such that she will be removed from the Program and reincarcerated.

77. The U.S. Constitution's Ex Post Facto Clause prohibits that retroactive increase in Ms. Polston's punishment. U.S. Const. art. I, § 10, cl. 1.

78. The Ex Post Facto Clause is one of the "first principles of the social compact." THE FEDERALIST No. 44, at 282 (Madison). From the earliest days of our Republic, the Supreme Court has held that all retroactive criminal laws are "manifestly unjust and oppressive." *Calder v. Bull*, 3 U.S. 386, 391 (1798). Thus, the original Constitution, even before any amendments, prohibited ex post facto laws, which retroactively "increase the punishment" for a crime. *See id.*

79. Accordingly, any ex post facto act is null and void: "An ACT of the Legislature (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority." *Id.* at 388; *see, e.g.*, *Ellingburg v. United States*, 607 U.S. 163, 170 (2026) (Thomas, J., concurring) ("Ex post facto laws lack legitimacy because laws must precede the

actions that they govern. Laws regulating actions after the fact deprive citizens of notice and fair warning and are, therefore, an affront to man's 'reason and freewill.'" (citation modified) (quoting 1 W. BLACKSTONE, COMMENTARIES 39 (1765))).

80. For example, *In re Medley* invalidated a Colorado law, as applied to a prisoner who committed his offense prior to the law's enactment, requiring death row inmates to be moved to solitary confinement, and requiring that knowledge of the date and time of their execution be withheld from them. 134 U.S. 160, 170–71 (1890). This change to the conditions of a prisoner's incarceration was "an additional punishment" and was "therefore forbidden by" the Ex Post Facto Clause. *Id.* at 171. Only the law in place at the time of a crime may be applied to a defendant "in all particulars of trial and punishment." *Id.* at 166.

81. Similarly, in *Weaver v. Graham*, the Supreme Court held a statute removing current inmates' ability to earn gain-time credits to reduce their sentence of imprisonment violated the Ex Post Facto Clause. 450 U.S. at 24. "[E]ven if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense." *Id.* at 30–31. In that case, "a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." *Id.* at 32. The law at issue in *Weaver* violated the Ex Post Facto Clause because it "lengthen[ed] the period that someone in petitioner's position must spend in prison." *Id.* at 33. The same is true here if Defendant is allowed to apply SB137 to remove Ms. Polston from the Program and put her back in prison.

82. “The critical question,” therefore, “is whether the new provision imposes greater punishment after the commission of the offense, not merely whether it increases a criminal sentence.” *Id.* at 32 n.17. And “a statute may be retrospective even if it alters punitive conditions outside the sentence.” *Id.* at 32. When a state law “makes more onerous the punishment for crimes committed before its enactment,” that “result runs afoul of the prohibition against ex post facto laws.” *Id.* at 36. Yet that is just what Defendant seeks to do by applying SB137 retroactively against Ms. Polston to remove her from the Program and reincarcerate her.

83. There can be no question that SB137 was enacted after Ms. Polston committed her crime, pled guilty, was sentenced, and was enrolled in the Program. Thus, enforcing SB137 against Ms. Polston to remove her from the Program would be retroactive.

84. Moreover, removing Ms. Polston from the Program—taking her from her home and family to put her in a prison cell—undoubtedly increases her punishment. While in the Program, Ms. Polston can live with and care for her husband and children at home. She can be a mother in person, from her children’s first waking minute to when she puts them to bed at night. She can make breakfast and dinner for her family and have every one of those meals with them—eating whatever and whenever she would like. She can pack her children’s lunches and attend their sports practices and recitals. She can help them with their homework. She can go to church with her family and serve the congregation. When family members pass away, she can attend their funeral and help settle the estate. She can continue participating in and contributing to her broader community, both in her job and through volunteering at Food & Shelter and other community services.

She can encourage others to avoid the tragic mistake that she made, including through her continued involvement in AA multiple days a week. In short, while Ms. Polston must wear a GPS device and is subject to a curfew from 7 a.m. to 7 p.m., in the Program she is able to "live[] a life generally free of the incidents of imprisonment." *Harper*, 520 U.S. at 148. But, if she is returned to prison, she will lose all these liberties and more.

85. Even Senator Hamilton stated that "for lack of a better word" Ms. Polston was "free" under the Program. *See* Pub. Safety Comm. Hr'g, at 9:29:33–9:29:51 a.m.

86. Losing this freedom qualifies as punishment. Incarceration is punishment, and being subjected to more time in prison is necessarily an *increase* in punishment. Pursuant to the faithful application of the laws as they existed at the time of her offense and sentencing, Ms. Polston is not currently subject to imprisonment. To put her back in prison—based on a law passed *after* her offense of conviction—violates the Ex Post Facto Clause. *See Lynce*, 519 U.S. at 441–47 (holding that a law that retroactively put a prisoner back behind bars after he had been released consistent with the laws that were in effect at the time of his crime violated the Ex Post Facto Clause); *Weaver*, 450 U.S. at 33–34 (holding that retroactively decreasing the amount of gain-time awarded for an inmate's good behavior violated the Ex Post Facto Clause because it "substantially alter[ed] the consequences attached to a crime already completed, and therefore change[d] the quantum of punishment." (citation omitted)); *see, e.g.*, *Lindsey v. Washington*, 301 U.S. 397, 400–01 (1937) (holding that applying a state law passed after petitioners' crimes were committed but before their sentencing violated the Ex Post Facto Clause because the new law mandated a 15-year sentence, where the prior law

merely permitted a 15-year maximum sentence, thus the new law was "more onerous than that of the old" one).

87. This Court should therefore declare SB137's retroactive application to Plaintiff unconstitutional and enjoin its enforcement against Plaintiff.

## SECOND CAUSE OF ACTION
## (DECLARATORY & INJUNCTIVE RELIEF— VIOLATION OF THE BILL OF ATTAINDER CLAUSE, U.S. CONST. ART. I, § 10, CL. 1)

88. Plaintiff incorporates by reference the above allegations.

89. This claim is brought under 42 U.S.C. § 1983, 28 U.S.C. § 2201, and *Ex parte Young*, 209 U.S. at 157.

90. Article I, Section 10, Clause 1 of the U.S. Constitution prohibits bills of attainder.

91. Bills of attainder are legislative acts "that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *United States v. Lovett*, 328 U.S. 303, 315 (1946). They are "legislative acts passed for the special purpose of attainting particular individuals . . . to inflict pains and penalties beyond, or contrary to the common law . . . [and] are state-engines of oppression in the last resort . . . ." *See* St. George Tucker, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE TO THE CONSTITUTION AND LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES AND THE COMMONWEALTH OF VIRGINIA 348 (Phil. 1803) (reprint 1969).

92. The evil that the Founders sought to prevent was "legislative punishment, of any form or severity, of specifically designated persons or groups." *United States v. Brown*, 381 U.S. 437, 447 (1965). In doing so, the prohibition against bills of attainder serves as a vital "bulwark against tyranny." *Id.* at 443.

93. For an act to be a prohibited bill of attainder, it must "inflict punishment." *Lovett*, 328 U.S. at 315.

94. Imprisonment is one form of punishment barred by the Bill of Attainder Clause. *Nixon*, 433 U.S. at 474.

95. As an example of a bill of attainder imposing imprisonment, the Supreme Court in *Nixon* pointed to an English law from 1701 titled "An Act for *continuing* the Imprisonment of Counter and others, for the late horrid Conspiracy to assassinate the Person of his sacred Majesty." 433 U.S. at 474 n.36 (quoting 10 & 11 Will. 3, c. 13 (1701) (emphasis added)).

96. The State's actions here are targeted at one individual: Ms. Polston. *See* Pub. Safety Comm. Hr'g, at 9:28:33–9:29:51 a.m.; Hamilton Press Release, *supra* ¶ 12 (noting that "the impetus of the bill was a prior situation in which the perpetrator in a tragic drunk driving accident was released through the electronic monitoring program after only serving a minuscule portion of their sentence.").[10]

97. It was not just Senator Hamilton that linked SB137 to Ms. Polston. The Oklahoma Senate leader at the February 24, 2026 Public Safety Committee hearing—just days after Ms. Polston's release—praised Senator Hamilton for introducing it, saying "this obviously came to light to a lot of us a few days ago." Pub. Safety Comm. Hr'g, at 9:34:45–9:35:30 a.m. (Sen. Pro Tempore Paxton).

98. And Senator Hamilton admitted that he introduced SB137 with Ms. Polston in mind. He criticized Ms. Polston's release on the Program, saying the "defendant was released from the penitentiary and placed on the electronic

---

[10] *See also* Ashlynd Baecht, *Outcry Over 73-day Prison Stay Spurs Push to Tighten Oklahoma Early Release Program*, The Frontier (Feb. 24, 2026), https://perma.cc/KB2D-5S7U.

monitoring program, which allowed the defendant to be, for lack of a better word, free via—via an ankle bracelet after 73 days in custody." *Id.* at 9:29:33–9:29:51 a.m.; *see also* Baecht, *supra* ¶ 95.

99. He claimed that "the GPS program essentially 'freed' Polston." *Id.* He was quoted as saying that "[t]his unfortunate situation has brought to light a hole within our law." Baecht, *supra* ¶ 95. So, the Oklahoma Legislature set about to change the law because of how it was applied to Ms. Polston. *See id.*; *see also* Pub. Safety Comm. Hr'g, at 9:28:33–9:30:41 a.m.

100. SB137 made only one new crime ineligible for the Program: Ms. Polston's crime. *See* 2026 Okla. Sess. Law Serv. ch. 157 (SB137) (adding § 510.9(B)(14) to make DUI-GBI under 47 O.S. § 11-904 an ineligible offense).

101. And Defendant seek to apply the amendment to subsection (D) to retroactively target Ms. Polston to increase her punishment by removing her from the Program and reincarcerating her.

102. Throughout the Multicounty Grand Jury process, too, the State targeted Ms. Polston exclusively. *See* MCGJ Report, at 16.

103. Because SB137 constitutes a bill of attainder, Plaintiff respectfully asks this Court to declare it unconstitutional and enjoin its retroactive enforcement against Plaintiff.

## <u>THIRD CAUSE OF ACTION</u><br><u>(DECLARATORY & INJUNCTIVE RELIEF—</u><br><u>VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT)</u>

104. Plaintiff incorporates by reference the above allegations.

105. This claim is brought under 42 U.S.C. § 1983, 28 U.S.C. § 2201, and *Ex parte Young*, 209 U.S. at 157.

106. "[T]he Due Process Clause shields from arbitrary or capricious deprivation those facets of a convicted criminal's existence that qualify as liberty interests." *Harper*, 64 F.3d at 564.

107. Oklahoma has previously failed to comply with the due process rights of inmates on community release programs. In one notable example, a prisoner named Ernest Eugene Harper was approved for an analogous community supervision program,[11] the Pre-Parole Conditional Supervision ("PPCS") Program and transferred to custody in the community. *See id. at* 567. But five months later when he was denied full parole, Mr. Harper received a 5:30 a.m. phone call from his probation officer telling him to report to his probation office by 10:00 a.m. that morning and was whisked straight to prison. Having been reincarcerated with little notice and no opportunity to be heard, Mr. Harper challenged his confinement. *Id.*

108. The Oklahoma Department of Corrections fought his petition, arguing that "placement in the Program does not effect release from the custody of the Department of Corrections and is, therefore, merely a change in the degree or situs of an inmate's confinement." *Id.* at 565.

[11] At the time Sara Polston was initially reviewed and recommended for the Program, the Oklahoma Department of Corrections Specialized Programs Case Management Policy grouped the electronic monitoring program with PPCS (now called Specialized Parole, *see* 57 O.S. § 365 (2025); *see also* 57 O.S. § 365 (1997)) and imposed the same requirements on each. *See* Exhibit 3, Okla. Dep't of Corr., Specialized Programs Case Management, OP-161001, at §§ (I)(B) & (II) (eff. Jan. 14, 2022), available at https://perma.cc/UR84-XBZC (since updated effective Jan. 13, 2026). And the Court of Criminal Appeals recognized that they create the same kind of community custody. *See Fields v. Driesel*, 1997 OK CR 33, ¶ 27, 941 P.2d 1000, 1006.

109. While the Oklahoma Court of Criminal Appeals adopted that position, the Tenth Circuit granted Mr. Harper relief. It held that the program was the equivalent of parole for purposes of the process required for removal: "There is no question but that those in the Program enjoy the benefits and joys of gainful employment, the company of family and friends, and the pursuits of humdrum existence." *Id.* at 567.

110. The Department of Corrections sought certiorari from the Supreme Court "on the limited question whether preparole 'is more similar to parole or minimum security imprisonment; and, thus, whether continued participation in such program is protected by the Due Process Clause of the Fourteenth Amendment.'" *Harper*, 520 U.S. at 147.

111. Justice Clarence Thomas, writing for a unanimous Court, rejected the Department of Corrections' position out of hand. *Id.* The Supreme Court held that Oklahoma had violated Mr. Harper's due process rights when it automatically removed him from community supervision program without an individualized hearing that complied with the procedures commanded by *Morrissey v. Brewer*, 408 U.S. 471 (1972). *See Harper*, 520 U.S. at 147.

112. The Oklahoma statute in place when Ms. Polston was sentenced and placed in the Program guarantees her continued participation.

113. Though she has some restrictions on her liberty, she has been granted the liberty of living at her home, working at an approved job, attending church, and serving in her community. In short, Oklahoma law has granted her the ability to "live[] a life generally free of the incidents of imprisonment." *Harper*, 520 U.S. at

148. As even Senator Hamilton recognized, Ms. Polston has been "released" and is "free" under the Program. *See* Pub. Safety Comm. Hr'g, at 9:29:33–9:29:51 a.m.

114. Under the law as it existed when she entered the Program, Ms. Polston's continued participation came with a legal guarantee that she "*shall* remain in such program" until she "discharges the term of the sentence," is "removed . . . for violation of any rule or condition," or is "paroled." § 510.9(C) (2025) (emphasis added). None has occurred.

115. At the time she entered the Program, she was also guaranteed certain established procedures that the State would follow before it removed her from the program. *See* Exhibit 4, "Program Removal Hearing Procedures," Attachment A, Specialized Programs Case Mgmt., *supra* ¶ 44.[12]

116. Since SB137 has been enacted, however, Ms. Polston now has a credible fear that Defendant will subject to her mandatory and automatic removal from the Program, without notice, an opportunity to be heard, or any of the other procedural protections described in *Morrissey* and its progeny. There is a credible threat Ms. Polston will be yanked out of her home and community and reincarcerated without any procedural protections, just as the Department of Corrections did with Mr. Harper.

117. Neither the U.S. Constitution nor Oklahoma law permits this result.

118. The threatened automatic and mandatory removal of Ms. Polston from the Program, coupled with any reincarceration, would be a blatant and open violation of Ms. Polston's rights under the Due Process Clause of the Fourteenth Amendment.

---

[12] https://perma.cc/HX22-NZ7A.

119. Removal of Ms. Polston from the Program and reincarcerating her without sufficient justification violates the Due Process Clause of the Fourteenth Amendment.

120. The Supreme Court has already held that Oklahoma violates due process when it removes a person from a program where they enjoy the ability to "live[] a life generally free of the incidents of imprisonment," *Harper*, 520 U.S. at 148—even if that person is still technically "within the custody of the Department of Corrections," *id.* at 149—because that status does not "render such liberty beyond procedural protection," *id.* at 148.

121. Where "the State itself has not only provided a statutory right to" a program benefiting an inmate "but also specifies that it is to be forfeited only for serious misbehavior . . . . the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Wolff*, 418 U.S. at 557.

122. This Court should therefore declare that automatic removal and reincarceration of Ms. Polston from the Program violates the Fourteenth Amendment's Due Process Clause and enjoin any such enforcement of SB137 against Ms. Polston.

## PRAYER FOR RELIEF

Accordingly, Ms. Polston prays:

A. For a declaration that SB137, as applied retroactively to Ms. Polston to remove her from the Electronic Monitoring Program and reincarcerate her without process, violates the Ex Post Facto and Bill of Attainder Clauses of Article I, section 10, clause 1 and the Due Process Clause of the Fourteenth Amendment of the United States Constitution and is therefore null and void under the Supremacy Clause and is unenforceable against Ms. Polston;

B. For a preliminary and permanent injunction barring Defendant Farris from removing Ms. Polston from the Electronic Monitoring Program and reincarcerating her under SB137;

C. For such costs and reasonable attorney's fees to which she is entitled under 42 U.S.C. § 1988(b); and

D. For any other relief that the Court deems just and proper.

Dated: August 26, 2026

Respectfully submitted,

/s/ *Mithun Mansinghani*

Mithun Mansinghani
LEHOTSKY COHN LLP
629 W. Main St.
Oklahoma City, OK 73102
Telephone: (512) 693-8350
mithun@lehotskycohn.com

Mark Rothrock
LEHOTSKY COHN LLP
8513 Caldbeck Dr.
Raleigh, NC 17615
Telephone: (512) 693-8350
mark@lehotskycohn.com

Jonathan DeWitt*
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW
Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
jdewitt@lehotskycohn.com

**admission pending*

*Counsel for Plaintiff Sara Polston*

## DECLARATION UNDER PENALTY OF PERJURY

I, Sara Polston, am over the age of 18 and the Plaintiff in this action. The statements and allegations about me or which I make in this VERIFIED COMPLAINT are true and correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalty of perjury that the foregoing is true and correct. *See* 28 U.S.C. § 1746.

Executed this 26 day of August 2026.

SARA POLSTON