**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

SARA POLSTON,

Plaintiff,

v.

JUSTIN FARRIS, in his official capacity as Director of the Oklahoma Department of Corrections,

Defendant.

) ) ) ) ) Case No. 26-cv-02265-G ) ) ) ) )

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION WITH BRIEF IN SUPPORT**

Mark Rothrock
LEHOTSKY COHN LLP
8513 Caldbeck Dr.
Raleigh, NC 17615
Telephone: (512) 693-8350
mark@lehotskycohn.com

Mithun Mansinghani
LEHOTSKY COHN LLP
629 W. Main St.
Oklahoma City, OK 73102
Telephone: (512) 693-8350
mithun@lehotskycohn.com

Jonathan DeWitt*
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW
Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
jdewitt@lehotskycohn.com

**admission pending*

*Counsel for Plaintiff Sara Polston*

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

BACKGROUND ........ 1

A. The Crime and Ms. Polston's Punishment ........ 1

B. The Call to Increase Ms. Polston's Punishment ........ 3

ARGUMENT ........ 5

**I. Ms. Polston is likely to succeed on the merits of her *Ex Post Facto*, Bill of Attainder, and Due Process claims.** ........ 5

A. Reimprisoning Ms. Polston under SB137 violates the *Ex Post Facto* Clause... ........ 5

1. Applying SB137 to remove Ms. Polston from the Program gives retrospective effect to SB137 ........ 6

2. Applying SB137 to remove Ms. Polston from the Program and reincarcerate her increases Ms. Polston's punishment. ........ 8

B. SB137 is an unlawful bill of attainder that targets Ms. Polston for increased punishment. ........ 12

1. SB137 specifically targets Ms. Polston. ........ 13

2. Removing Ms. Polston from the Program under SB137 inflicts punishment ........ 15

C. Summarily removing Ms. Polston from the Program under SB137 violates the Due Process Clause. ........ 18

1. Ms. Polston possesses protected liberty interests she has by being in the Program. ........ 19

2. Automatic removal of Ms. Polston from the Program denies the process required by the Due Process Clause. ........ 23

**II. Absent a preliminary injunction, Ms. Polston will suffer irreparable harm** ........ 23

**III. Both the balance of equities and public interest favor granting this injunction.** ........ 24

CONCLUSION ........ 25

**LIST OF ATTACHMENTS:**

Exhibit 1, Rothrock Declaration (Aug. 26, 2026)

Exhibit 1.1, Lisa Monahan, "Norman Woman Convicted in 2023 DUI Case Released Early Due to State Law," NEWS9 (Feb. 19, 2026)

Exhibit 1.2, Press Release: "Senate Approves Hamilton Bill Preventing DUI Offenders' Participation in Electronic Monitoring Program," Okla. Senate (Mar. 25, 2026)

Exhibit 1.3, *In re Multicounty Grand Jury*, Case No. SCAD-2024-83, D.C. No. GJ-2024-3 (May 7, 2026)

Exhibit 1.4, Tanner DeLeon, "Bill aims to tackle loophole in a state law," KFOR (Feb. 25, 2026)

Exhibit 1.5, Nolan Clay, "Stitt donor Sara Polston sues to stay out of prison for drunk driving," THE OKLAHOMAN (Aug. 27, 2026)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Drummond*,
808 F. Supp. 3d 1266 (W.D. Okla. 2025)....24

*Arevalo v. Hennessy*,
882 F.3d 763 (9th Cir. 2018)....24

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012)....5, 25

*Awad v. Ziriax*,
754 F. Supp. 2d 1298 (W.D. Okla. 2010)....25

*Betschart v. Oregon*,
103 F.4th 607 (9th Cir. 2024)....24

*Bledsoe v. United States*,
384 F.3d 1232 (10th Cir. 2004)....5

*Blue v. Klinger*,
162 F.3d 1172 (10th Cir. 1998)....9

*Boutwell v. Keating*,
399 F.3d 1203 (10th Cir. 2005)....20

*Brown v. Montoya*,
662 F.3d 1152 (10th Cir. 2011)....18, 19, 23

*Calder v. Bull*,
3 U.S. (3 Dall.) 386 (1798)....6

*Carmell v. Texas*,
529 U.S. 513 (2000)....5

*Chamber of Com. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010)....24

*Collins v. Youngblood*,
497 U.S. 37 (1990) .......... 7

*Communist Party of the U.S. v. Subversive Activities Control Bd.*,
367 U.S. 1 (1961) .......... 13

*Darren Patterson Christian Acad. v. Roy*,
699 F. Supp. 3d 1163 (D. Colo. 2023) .......... 24

*Ellingburg v. United States*,
607 U.S. 163 (2026) .......... 6, 7

*Fields v. Driesel*,
1997 OK CR 33, 941 P.2d 1000 .......... 22

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) .......... 25

*Flemming v. Nestor*,
363 U.S. 603 (1960) .......... 16

*Fletcher v. Reilly*,
433 F.3d 867 (D.C. Cir. 2006) .......... 10

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003) .......... 15, 18

*Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*,
916 F.3d 792 (10th Cir. 2019) .......... 24, 25

*Harper v. Young*,
64 F.3d 563 (10th Cir. 1995) .......... 9, 18, 19, 20, 21, 22, 23

*Hill v. Snyder*,
878 F.3d 193 (6th Cir. 2017) .......... 6

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) .......... 6, 7

*Lawhead v. Ward*,
214 F. App’x 836 (10th Cir. 2007) .......... 6

*Lynce v. Mathis*,
519 U.S. 433 (1997) ............................................................ 6, 7, 8, 9, 10, 11

*In re Medley*,
134 U.S. 160 (1890) ............................................................ 11, 12

*Merrifield v. Bd. of Cnty. Comm'rs*,
654 F.3d 1073 (10th Cir. 2011) ............................................................ 19

*Mickens-Thomas v. Vaughn*,
321 F.3d 374 (3d Cir. 2003) ............................................................ 6, 10

*Morrissey v. Brewer*,
408 U.S. 471 (1972) ............................................................ 20, 21, 22, 23

*Nixon v. Admin. of Gen. Servs.*,
433 U.S. 425 (1977) ............................................................ 16, 17, 18

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................ 24, 25

*Ortega v. Grisham*,
148 F.4th 1134 (10th Cir. 2025) ............................................................ 24, 25

*Peugh v. United States*,
569 U.S. 530 (2013) ............................................................ 5, 11

*Reynolds v. Quiros*,
990 F.3d 286 (2d Cir. 2021) ............................................................ 15, 16

*Rodriguez v. U.S. Parole Comm'n*,
594 F.2d 170 (7th Cir. 1979) ............................................................ 9

*Selective Serv. Sys. v. Minn. Pub. Interest Grp.*,
468 U.S. 841 (1984) ............................................................ 12, 13, 15, 16, 17, 18

*Shaw v. Smith*,
166 F.4th 61 (10th Cir. 2026) ............................................................ 24

*State v. Polston*,
No. CF-2023-973 (Cleveland Cnty. D. Ct. Dec. 8, 2025) ............................................................ 1, 2

*United States v. Brown*,
381 U.S. 437 (1965) .......... 12, 13, 15

*United States v. Lovett*,
328 U.S. 303 (1946) .......... 12

*Weaver v. Graham*,
450 U.S. 24 (1981) .......... 6, 7, 8, 9, 11, 12

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 5

**Statutes**

57 O.S. § 510.9 (2021) .......... 2, 9

57 O.S. § 510.9 .......... 2, 13, 20

57 O.S. § 510.10 (1996) .......... 22

Act Relating to the Department of Corrections,
2026 Okla. Sess. Law Serv. ch. 157 .......... 3

1997 Okla. Sess. Laws ch. 133, § 31 .......... 22

**Other Authorities**

11A Wright & Miller's Fed. Prac. & Proc. § 2948.2 (3d ed. 2018) .......... 25

*An Act for continuing the Imprisonment of Counter and others, for the late horrid Conspiracy to assassinate the Person of his sacred Majesty*, 10 & 11 Will. 3, c.13 (1701) .......... 16

Feb. 24, 2026 Pub. Safety Comm. Hr'g, https://oksenate.gov/live-chamber (archived at https://perma.cc/5W28-DQPW) .......... 3, 4, 14, 15

THE FEDERALIST NO. 44 (J. Madison) (C. Rossiter ed., 1961) .......... 5

THE FEDERALIST NO. 84 (A. Hamilton) (P. Ford ed., 1898) .......... 6

## INTRODUCTION

Defendant seeks to enforce a new Oklahoma law, Senate Bill 137, to retroactively increase the punishment imposed on Plaintiff, Ms. Polston, for a crime she committed before the law was enacted. This violates the *Ex Post Facto* Clause and Bill of Attainder Clause of the U.S. Constitution. Moreover, summarily returning Ms. Polston to prison under Senate Bill 137 would deprive her of liberty interests without due process. Ms. Polston is thus likely to succeed on the merits of her claims and will undoubtedly be irreparably harmed without a preliminary injunction from this Court enjoining her reincarceration.

Equity also favors an injunction because Defendant has no cognizable interest in unconstitutionally enforcing new state laws, Ms. Polston's current participation in a GPS monitoring program outside of prison does not pose any substantial threat to public safety, and upholding the constitutional rights of a citizen is always in the public's interest. Plaintiff thus moves this Court to preliminarily enjoin the reimprisonment of Ms. Polston under Senate Bill 137 before that law takes effect on November 1, 2026, thereby preserving the status quo while this litigation proceeds.

## BACKGROUND

### A. The Crime and Ms. Polston's Punishment

In 2023, Ms. Polston made a terrible mistake. She drank excessively and got behind the wheel of a car. She crashed into the vehicle of a young woman, Micaela Borrego, causing her great harm. Ms. Polston was charged with and pleaded guilty to Causing an Accident Resulting in Great Bodily Injury While Driving Under the Influence of Alcohol with Blood Alcohol Content of 0.15 or Higher, in violation of 47 O.S. § 11-904(B) ("DUI-GBI"). *State v. Polston*, No. CF-2023-973 (Cleveland Cnty.

D. Ct. Dec. 8, 2025). On December 5, 2025, the court imposed on Ms. Polston a fifteen-year sentence, with the first eight years to be served in the custody of the Oklahoma Department of Corrections ("ODOC") and the rest suspended. *Id.* Ms. Polston accepted this sentence and did not appeal.

Under Oklahoma law, ODOC evaluated Ms. Polston—like every other inmate—to see if she qualified for any of the State's diversionary programs. She did: ODOC officials found that she met the statutory requirements for the Electronic Monitoring Program (the "Program"), 57 O.S. § 510.9 (2021). On February 19, 2026, ODOC released Ms. Polston from prison and assigned her to the Program. While in the Program, Ms. Polston wears a Global Positioning System ("GPS") ankle monitor, she cannot go to bars, casinos, or dispensaries, and she has regular check-ins with an ODOC probation officer, among other Program requirements. But she is not in prison. The Program authorizes her to serve her sentence at her home and as part of her community. She is able to support and be supported by her husband, to take care of her family, and to be present for her children—cooking meals, helping with homework, and running bedtime routines. She is able to work an approved job. She attends church and her children's dance recitals and sports practices. She is also able to give back and continue serving the homeless and low-income members of her community.

Both Oklahoma statutes and ODOC policy expressly provide she would remain in the Program until one of three things happened: she discharges her sentence, she violates any rule or condition of the Program, or she is granted parole. 57 O.S. § 510.9(C)(1)-(3). Ms. Polston has not discharged her sentence nor has she been paroled, and she has complied with all Program rules and conditions.

If she were to be charged with violating any rule or condition of the Program, she would be entitled to specified procedures before being removed from the Program, including a written violation report, an evidentiary hearing, and a right to appeal the determination of the hearing officer. Verified Complaint, Doc. 1, Ex. 4, "Program Removal Hearing Procedures," Attachment A, Specialized Programs Case Mgmt., Okla. Dep't of Corrs., OP-161001 (eff. Jan. 13, 2026).

**B. The Call to Increase Ms. Polston's Punishment**

After news of Ms. Polston's enrollment in the Program broke in the press, the Cleveland County District Attorney, whose office prosecuted Ms. Polston, called on the Oklahoma Legislature to take action to address Ms. Polston's release. *See* Rothrock Decl., Ex. 1.1, Lisa Monahan, "Norman Woman Convicted in 2023 DUI Case Released Early Due to State Law," NEWS9 (Feb. 19, 2026). Days later, Senator Warren Hamilton introduced Senate Bill 137 ("SB137") in the Senate Public Safety Committee. *See* Verified Compl., Doc. 1, ¶ 53 & n.6.[1]

On May 5, 2026, SB137 became law, amending § 510.9 in two ways: (1) it made DUI-GBI under 47 O.S. § 11-904 an offense ineligible for the Program; and (2) it added a sentence to section (D) providing that "Loss of eligibility for the program shall result in removal of the inmate from the program." *See* Act Relating to the Department of Corrections, 2026 Okla. Sess. Law Serv. ch. 157. The Senate author for SB137 admitted that Ms. Polston was the "impetus of the bill." Ex. 1.2, Press Release: "Senate Approves Hamilton Bill Preventing DUI Offenders' Participation in Electronic Monitoring Program," Okla. Senate (Mar. 25, 2026) ("Hamilton Press

[1] *See* Feb. 24, 2026 Pub. Safety Comm. Hr'g, https://oksenate.gov/live-chamber (archived at https://perma.cc/5W28-DQPW).

Release"). He criticized the Program for "free[ing]" Ms. Polston, referred to it as an "unfortunate situation," and described the bill as "a very simple fix" for Ms. Polston's assignment to the "electronic monitoring program . . . after 73 days in custody." *See* Okla. Senate Pub. Safety Comm. Hr'g, Live Recording (Feb. 24, 2026), *supra* n.1, 9:28:24-9:36:45 a.m.

Meanwhile, Oklahoma Attorney General Gentner Drummond empaneled a Multicounty Grand Jury to investigate ODOC's assignment of Ms. Polston to the Program. On May 7, 2026, the grand jury issued a report that found no criminal wrongdoing from Ms. Polston's enrollment in the Program, but it praised SB137's enactment and admonished that "DOC should amend its policies requiring any inmate currently sentenced for [DUI-GBI] on the GPS Program to be *immediately* returned to traditional DOC custody." Rothrock Decl., Ex. 1.3, *In re Multicounty Grand Jury*, Case No. SCAD-2024-83, D.C. No. GJ-2024-3 (May 7, 2026) ("MCGJ Report"), at 13-14 (emphasis added). Defendant Farris, meanwhile, commented on SB137 through an ODOC spokesperson, stating that ODOC would "compl[y] with all state laws enacted by lawmakers." Rothrock Decl., Ex. 1.4, Tanner DeLeon, "Bill aims to tackle loophole in a state law," KFOR (Feb. 25, 2026).

In response to this suit, the Attorney General's office stated Ms. Polston "belongs in prison" and that "[h]ome confinement does not create a right to remain there." Rothrock Decl., Ex. 1.5, Nolan Clay, "Stitt donor Sara Polston sues to stay out of prison for drunk driving," THE OKLAHOMAN (Aug. 27, 2026). Accordingly, unless enjoined, there is a credible threat that SB137 will be applied retroactively to Ms. Polston to remove her from the Program and reimprison her when SB137 becomes effective on November 1, 2026.

## ARGUMENT

A party "seeking a preliminary injunction must establish that" they are "likely to succeed on the merits," that they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When requested injunctions—like the one here—seek to preserve rather than "alter the status quo," they are not "disfavored." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (citation omitted).

### I. Ms. Polston is likely to succeed on the merits of her *Ex Post Facto*, Bill of Attainder, and Due Process claims.

#### A. Reimprisoning Ms. Polston under SB137 violates the *Ex Post Facto* Clause.

Applying SB137 to retroactively to increase Ms. Polston's punishment beyond what Oklahoma law provided at the time of her crime violates the *Ex Post Facto* Clause of Article, § 10 of the Constitution. Removing Ms. Polston from her home and family and putting her behind bars is a "detrimental change" that SB137 would inflict via a change in law "after the date" of the conduct in question, so such enforcement is a retroactive increase in punishment that is unconstitutional. *Bledsoe v. United States*, 384 F.3d 1232, 1238 n.6 (10th Cir. 2004).

It is a "'first principle[] of the social compact and to every principle of sound legislation'" that a legislature may not increase the punishment for a crime after it has happened. *Carmell v. Texas*, 529 U.S. 513, 521 (2000) (quoting THE FEDERALIST NO. 44, at 282 (J. Madison) (C. Rossiter ed., 1961)). Thus, since our Nation's earliest days the Constitution has forbidden *ex post facto* laws, "a category that includes, as relevant here, '[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.'" *Peugh v.*

*United States*, 569 U.S. 530, 530-31 (2013) (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798) (Chase, J.)). "All these, and similar laws, are manifestly unjust and oppressive." *Calder*, 3 U.S. at 391. And "the prohibition of ex post facto laws" is "among the greatest 'securities to liberty and republicanism.'" *Ellingburg v. United States*, 607 U.S. 163, 170 (2026) (Thomas, J., concurring) (quoting THE FEDERALIST NO. 84, at 571 (A. Hamilton) (P. Ford ed., 1898)).

An unconstitutional *ex post facto* law has two features. First, the law's threatened application must be "retrospective—that is, 'it must apply to events occurring before its enactment.'" *Lynce v. Mathis*, 519 U.S. 433, 441 (1997). Second, the law "must disadvantage the offender affected by it." *Id.*; *see Hill v. Snyder*, 878 F.3d 193, 211 (6th Cir. 2017); *Lawhead v. Ward*, 214 F. App'x 836, 839 (10th Cir. 2007); *Mickens-Thomas v. Vaughn*, 321 F.3d 374, 384 (3d Cir. 2003). If applied to Ms. Polston to remove her from the Program, SB137 disadvantages her by putting her in prison, and it does so retrospectively because it was enacted after Ms. Polston committed her crime, pled guilty, was sentenced, and was released from prison.

**1. Applying SB137 to remove Ms. Polston from the Program gives retrospective effect to SB137.**

Removing Ms. Polston from the Program pursuant to SB137 based on the crime she committed before SB137's enactment would give SB137 retrospective effect. While SB137 does not become effective until November 1, 2026, "[t]he ban on retrospective legislation embrace[s] 'all statutes, which, though operating only from their passage, affect vested rights and past transactions.'" *Landgraf v. USI Film Prods.*, 511 U.S. 244, 268-69 (1994); *see Weaver v. Graham*, 450 U.S. 24, 31 (1981) (rejecting argument that a law "is not retrospective" merely because "it applies only after its effective date"). Thus, a law's retroactive effects need not be

"explicit[]" to fail *ex post facto* scrutiny. *Landgraf*, 511 U.S. at 268. (explaining that to cabin the Clause in that way "would be 'utterly subversive of all the objects' of the prohibition" (citation omitted)). To the contrary, "[s]ubtle *ex post facto* violations are no more permissible than overt ones." *Collins v. Youngblood*, 497 U.S. 37, 46 (1990). The relevant inquiry is whether the law attaches consequences to acts that occurred prior to the law's enactment: "*Ex post facto* laws lack legitimacy because laws must precede the actions that they govern." *Ellingburg*, 607 U.S. at 170 (Thomas, J., concurring); *see Weaver*, 450 U.S. at 31 (asking whether law applies to persons "convicted for acts committed before the provision's effective date").

The Supreme Court's decision in *Lynce* is instructive. There, the Supreme Court considered whether a Florida statute canceling early release credits that had already been awarded and applied to a convicted person violated the *Ex Post Facto* Clause. *See Lynce,* 519 U.S. at 435. The state had released the petitioner early after he had earned those credits during his imprisonment. After his release, the legislature amended the relevant statute to exclude inmates with the petitioner's offense of conviction from receiving early release credits. *Id.* at 438-39. The state attorney general then issued an opinion that the law applied retroactively, and petitioner was rearrested and returned to prison. *Id.* The Court held that the law was "clearly retrospective" because it had the effect of "cancel[ing] overcrowding credits and the consequent reincarceration of petitioner." *Id.* at 441. So too here. The State seeks to reimprison Ms. Polston under SB137 because of the crime she committed even though that law was enacted after Ms. Polston committed her crime and, indeed, after she was released from prison into the Program. Thus, the threatened application of SB137 to Ms. Polston is undeniably retrospective.

**2. Applying SB137 to remove Ms. Polston from the Program and reincarcerate her increases Ms. Polston's punishment.**

Removing Ms. Polston from the Program and reimprisoning her also increases the punishment associated with Ms. Polston's offense of conviction. "To fall within the ex post facto prohibition," a retrospective law "must disadvantage the offender affected by it." *Lynce*, 519 U.S. at 441 (citation omitted).

Again, consider the Supreme Court's decision in *Lynce*: When a new Florida law was applied to cancel the early release credits granted to a convicted person based on his earlier crime, "the consequent reincarceration of petitioner" constituted an increase in punishment that violated the *Ex Post Facto* Clause. 519 U.S. at 441. Similarly, in *Weaver*, the Supreme Court held that it was unconstitutional to apply a law reducing the availability of early-release credits retroactively because that "substantially alters the consequences attached to a crime already completed, and therefore changes 'the quantum of punishment" by extending the time inmates "must spend in prison." 450 U.S. at 33. In both cases, the Court held those laws had the effect of "lengthening petitioner's period of incarceration." *Lynce*, 519 U.S. at 442-43 (discussing *Weaver*, 450 U.S. at 33). They were, therefore, retroactive punishment that violated the *Ex Post Facto* Clause. *Id.* As the Court explained, the "retroactive alteration of parole or early release provisions, like the retroactive application of provisions that govern initial sentencing, implicates the *Ex Post Facto* Clause because such credits are 'one determinant of petitioner's prison term and the petitioner's effective sentence is altered once this determinant is changed.'" *Id.* at 445 (quoting *Weaver*, 450 U.S. at 32). Thus, if a retroactive statute results in the "rearrest and prolong[ing]" of a

person's imprisonment, it "unquestionably disadvantage[s]" the person in violation of the *Ex Post Facto* Clause. *Id.* at 446-47.

Here, application of SB137 to Ms. Polston to remove her from the Program does exactly that—it lengthens her period of incarceration by placing her back behind bars. When she committed her crime on February 7, 2023, the statutory punishment for that crime included community supervision under the Program. *See* 57 O.S. § 510.9(A)-(B) (2021). So too when she pled guilty and was sentenced. Then, under the law in effect at the time, the State removed Ms. Polston from prison by enrolling her in the Program.

Like an inmate released on parole, she currently "enjoy[s] the benefits and joys of gainful employment, the company of family and friends, and the pursuits of humdrum existence." *Harper v. Young*, 64 F.3d 563, 567 (10th Cir. 1995), *aff'd sub nom. Young v. Harper*, 520 U.S. 143 (1997). When she passed "outside the walls of a prison" it worked "a fundamental change in the *kind* of confinement, a transformation that signals the existence of an inherent liberty interest . . . ." *Id.* at 566. As in *Lynce* and *Weaver*, any subsequent removal of Ms. Polston from the Program would increase her time behind bars pursuant to a law passed after her conviction and would thus violate the *Ex Post Facto* Clause. *See, e.g.*, *Weaver*, 450 U.S. at 32, 35-36 (citing with approval *Rodriguez v. U.S. Parole Comm'n*, 594 F.2d 170, 170 (7th Cir. 1979), which held that retroactively applying a new rule that denied prisoner any meaningful opportunity for parole, violated the *Ex Post Facto* Clause); *Blue v. Klinger*, 162 F.3d 1172 (10th Cir. 1998) (unpublished table opinion) (holding that an Oklahoma statute eliminating a prisoner's eligibility for "pre-parole or early release" constitutes "a violation of the Ex Post Facto Clause" if the

plaintiff demonstrated he was "entitled to pre-parole or early release under the pre-Act statutes"); *see also Fletcher v. Reilly*, 433 F.3d 867, 877 (D.C. Cir. 2006) (explaining that "a retroactively applied parole or reparole regulation . . . violates the Ex Post Facto Clause" if it has the "practical effect" of "prolonging an inmate's incarceration" (citation modified)); *Mickens-Thomas*, 321 F.3d at 391-94 (3d Cir. 2003) (explaining that petitioner had a "constitutional expectation that the parole guidelines extant at the time of the crime would be applied," and holding that retroactive application of new parole guidelines violated the *Ex Post Facto* Clause because it rendered the petitioner's "prospects for parole . . . more remote" thus "increas[ing] the period of incarceration").

In all these cases, it was immaterial that the prisoner may still have had time remaining on his original sentence—he was eligible for or was actually released under a prior version of the early-release credit, parole, or pre-parole statute, and when the state later amended that statute to his disadvantage, that change placed the law in violation of the *Ex Post Facto* Clause. For example, in *Lynce*, the "essential inquiry demanded by the *Ex Post Facto* Clause" is "whether the cancellation of 1,860 days of accumulated provisional credits had the effect of lengthening petitioner's period of incarceration." 519 U.S. at 442-43. There, the "statute did more than simply remove a mechanism that created an *opportunity* for early release for a class of prisoners whose release was unlikely; rather, it made ineligible for early release a class of prisoners who were previously eligible." *Id.* at 447.

The same is true here: Retroactive application of SB137 to remove Ms. Polston from the Program by deeming her ineligible even though she was previously eligible—and thereby lengthening the time she is incarcerated—increases her

punishment in violation of the *Ex Post Facto* Clause. It does not matter whether Ms. Polston has a vested, enforceable, or affirmative right to have been enrolled or remain in the Program because "even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense." *Weaver*, 450 U.S. at 30-31. Nor does the assertion that ODOC "exercise[d] some measure of discretion" in enrolling Ms. Polston into the Program "defeat an *ex post facto* claim." *Peugh*, 569 U.S. at 539. Finally, it does not matter whether the potential for entry into the Program "was in some technical sense part of [Ms. Polston's] sentence," because "a prisoner's *eligibility* for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." *Weaver*, 450 U.S. at 32; *see Lynce*, 519 U.S. at 445-46.

The increase in punishment prohibited by the *Ex Post Facto* Clause is not limited to the lengthening of sentences; the Clause also prohibits "alter[ing] punitive conditions outside the sentence" to a person's "detriment," including conditions of confinement. *Weaver*, 450 U.S. at 29, 32–33. For example, *In re Medley* involved a Colorado statute requiring existing death row inmates to be moved to solitary confinement. The Supreme Court held that law violated the *Ex Post Facto* Clause because it "alter[ed] the situation of the accused to his disadvantage"—it "was an additional punishment" and was "therefore forbidden." *In re Medley*, 134 U.S. 160, 171 (1890). The Court also held invalid an even lesser change in the condition of confinement—a new provision prohibiting the death row inmate from knowing the day and time of his execution. *Id.* at 172. The Court explicitly rejected the

proposition that a state can use a retrospective law to make an inmate's conditions of confinement more onerous without violating the *Ex Post Facto* Clause. *Id*. at 171. "The critical question . . . is whether the new provision imposes greater punishment after the commission of the offense, not merely whether it increases a criminal sentence." *Weaver*, 450 U.S. at 32 n.17.

By removing her from the Program and reincarcerating her, applying SB137 to Ms. Polston undoubtedly imposes greater punishment in violation of the *Ex Post Facto* Clause. She is therefore likely to succeed on the merits of this claim.

**B. SB137 is an unlawful bill of attainder that targets Ms. Polston for increased punishment.**

Ms. Polston is also likely to prevail on her Bill of Attainder Clause claim under Article I, § 10 of the Constitution because the Legislature specifically targeted Ms. Polston when enacting SB137 and reimprisoning her would inflict punishment.

Bills of attainder are legislative acts "that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *United States v. Lovett*, 328 U.S. 303, 315 (1946). The Bill of Attainder Clause has long been viewed as a critical part of the separation of powers. It "reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness, of, and levying appropriate punishment upon, specific persons." *United States v. Brown*, 381 U.S. 437, 445 (1965).

Courts consider three factors to determine whether a law is an unlawful bill of attainder: (1) the law must be a legislative act, (2) that targets an identifiable individual or group, (3) to inflict punishment on the individual or group. *Selective Serv. Sys. v. Minn. Pub. Interest Grp.*, 468 U.S. 841, 846-47 (1984). As an initial matter,

SB137 is a "legislative act" because the Oklahoma Legislature enacted the law. *See Brown*, 381 U.S. at 442-43. The remaining two factors are also satisfied here.

**1. SB137 specifically targets Ms. Polston.**

Oklahoma legislators have made it abundantly clear that SB137 was about Ms. Polston. A law may target an individual either expressly or implicitly. As the Supreme Court has explained:

> "[T]he singling out of an individual for legislatively prescribed punishment constitutes an attainder whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons."

*Selective Serv. Sys.*, 468 U.S. at 847 (quoting *Communist Party of the U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 86 (1961)).

Here, SB137 did only two things: First, it expressly made Ms. Polston's offense of conviction, DUI-GBI, ineligible for the Program. Second, it added that "Loss of eligibility for the program shall result in removal of the inmate from the program." § 510.9(B) & (D). By first making only Ms. Polston's offense ineligible and then adding that loss of eligibility for the program "shall result in removal of the inmate from the program," SB137 left no doubt who the Legislature was targeting.

Oklahoma legislators' actions and statements when enacting SB137 remove any doubt that Ms. Polston was targeted. The Senate author publicly admitted that Ms. Polston's release on the Program inspired the law. *See* Rothrock Decl., Ex. 1.2, Hamilton Press Release. While he did not mention her by name in the press release, Ms. Polston is readily identifiable as the author's target from what he did say: "Hamilton stated the impetus of the bill was a prior situation in which the perpetrator in a tragic drunk driving accident was released through the electronic

monitoring program after only serving a minuscule portion of their sentence." *Id.* At a Senate Public Safety Committee Hearing on February 24, 2026—just days after it was publicly reported that Ms. Polston was enrolled in the Program—Senator Hamilton was even more specific that the bill was aimed at her:

> Senate Bill 137 addresses a situation that is an unfortunate and tragic drunk driving accident . . . that recently came to light. What happened was there was a tragic drunk driving accident that left a young lady disabled. The driver who caused the accident was convicted of [DUI-GBI] . . . . The judge presiding over the case awarded a sentence that was approximately 15 years, which would have resulted in a substantial amount of time behind bars for the defendant. The defendant was released from the penitentiary and put on the electronic monitoring program, which allowed this defendant to be, for lack of a better word, free via an ankle bracelet after 73 days in custody. This unfortunate situation has brought to light a hole in our laws.

Sen. Warren Hamilton, Public Safety Comm. Hr'g, *supra* n.1.

During debate on the bill, Senate President Pro Tempore Paxton thanked Senator Hamilton for bringing the bill, expressed his support for it, and again linked it to Ms. Polston, saying "this obviously came to light to a lot of us a few days ago." *Id.* (9:34:45 – 9:35:30 a.m.).

Thus, as the legislators' statements make clear, Ms. Polston was the only person they had in mind when adopting SB137. She is the person who was "released from the penitentiary and put on the electronic monitoring program . . . after 73 days in custody." And as both the Senate author and the Senate President Pro Tempore mentioned in the February 24 hearing, the situation referred to had just "c[o]me to light a few days ago"—statements made five days after news of Ms. Polston's

release on the Program was publicized. *See* Rothrock Decl., Ex. 1.1; Sen. Warren Hamilton, Pub. Safety Comm. Hr'g 9:29:30-9:29:52.

Without question, then, SB137 targets Ms. Polston. *See Selective Serv. Sys.*, 468 U.S. at 847 (explaining that a law's description of "past conduct" that designates "particular persons" for punishment satisfies this element of the inquiry "whether [or not] the individual is called by name"); *see Reynolds v. Quiros*, 990 F.3d 286, 296-97 (2d Cir. 2021) (same). Even a facially general law targets identifiable persons where its triggering circumstances are "so exceedingly narrow and unlikely to coincide" that the affected persons are "easily ascertainable." *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003). SB137, which is designed to reach only Ms. Polston's offense of conviction, does exactly that.

**2. Removing Ms. Polston from the Program under SB137 inflicts punishment.**

Reincarcerating Ms. Polston under SB137 also inflicts punishment within the meaning of the Bill of Attainder Clause. The "evil the Framers . . . sought to bar" through the Bill of Attainder Clause was "legislative *punishment*, of any form or severity, of specifically designated persons or groups." *Brown*, 381 U.S. at 447 (emphasis added). And because the Bill of Attainder Clause was aimed at prohibiting "any form or severity" of targeted legislative punishment, *id.*, the Supreme Court has recognized three different ways for determining whether a law inflicts punishment in the bill of attainder context:

(1) whether the challenged statute falls within the historical meaning of legislative punishment;

(2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and

(3) whether the legislative record "evinces a [legislative] intent to punish."

*Selective Serv. Sys.*, 468 U.S. at 852 (quoting *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 473 (1977)). Historically "bills of pains and penalties commonly imposed imprisonment." *Id.* Indeed, when giving examples of paradigmatic bills of attainder, the Supreme Court pointed to an "infamous" law titled "An Act for ***continuing the Imprisonment*** of Counter and others, for the late horrid Conspiracy to assassinate the Person of his sacred Majesty." *Nixon*, 433 U.S. at 473-74 & n.36 (emphasis added) (quoting 10 & 11 Will. 3, c.13 (1701)).

Here, removing Ms. Polston from the Program under SB137 clearly punishes Ms. Polston because it would return her to prison—it would continue her imprisonment just like the British laws that inspired our Founders to include the Bill of Attainder Clause. It falls squarely within the "historical meaning of legislative punishment" because it inflicts "the 'infamous punishment' of imprisonment." *See Selective Serv. Sys.*, 468 U.S. at 852-53 (quoting *Flemming v. Nestor*, 363 U.S. 603, 617 (1960)).[2]

Nor is there any apparent nonpunitive purpose for SB137. It serves one purpose: imprisonment of those convicted of a specific crime. That's punitive. That's "a legislative policy designed to inflict punishment on an individual." *Nixon*, 433 U.S. at 478. SB137 is thus categorically different, for instance, from

---

[2] The Second Circuit recently affirmed that statutes mandating more restrictive forms of incarceration are "plainly punitive" for purposes of the Bill of Attainder Clause. *Reynolds*, 990 F.3d at 298 (explaining that the challenged law was "plainly punitive" because it "directs the Commissioner of Correction to house special circumstances inmates in administrative segregation, which is Connecticut's most restrictive form of incarceration" (citation modified)).

certain provisions of the Military Selective Service Act, which the Supreme Court upheld against a Bill of Attainder Clause challenge. That law, which denied federal financial aid to male students who failed to register for the draft, was designed to "improve compliance with the registration requirement" after "more than half a million young men" failed to register for the draft during the Vietnam War era. *Selective Serv. Sys.*, 468 U.S. at 854 (reasoning that the law also furthered "a fair allocation of scarce federal resources"). The law also denied federal benefits to "innocent as well as willful nonregistrants" alike, which did not evince a punitive purpose, the Court explained, because "punitive legislation ordinarily does not reach those whose failure to comply with the law is not willful." *Id.* at 855.

Or consider the statute at issue in *Nixon*, which directed the General Services Administration to preserve President Nixon's presidential papers and tape recordings following his resignation. 433 U.S. at 429. There, the Court reasoned that "legitimate justifications" for the statute included the need to "preserve information included in the materials . . . needed to complete the prosecutions of Watergate-related crimes," and to "safeguard the public interest in . . . access to materials . . . which are of general historical significance." *Id.* at 476-77. Here, SB137 evinces no such nonpunitive purpose. It punishes with imprisonment those convicted of a specific crime. It is thus "reasonable to conclude that punishment of individuals disadvantaged by" SB137 "was the purpose of the decisionmakers." *Id.* at 476.

The legislative record likewise "'evinces a [legislative] intent to punish.'" *Selective Serv. Sys.*, 468 U.S. at 852 (quoting *Nixon*, 433 U.S. at 478). Everything said at the Senate Committee hearing when SB137 was introduced shows that the

legislators thought Ms. Polston's punishment—which had "just recently come to light"—was too lenient and needed to be more severe. For instance, Senator Hamilton said in his press release that "[a]nyone who causes great bodily harm to another due to their decision to drive under the influence should be held accountable for their actions and *serve their entire sentence behind bars*." Rothrock Decl., Rothrock Decl., Ex. 1.2, Hamilton Press Release (emphasis added). It is hard to imagine a clearer legislative intent to punish. *See Foretich*, 351 F.3d at 1225-26 (explaining that a legislative record reflecting an intent to "correct an injustice" as to a specific person "evinces . . . intent to punish," even absent any "formal legislative announcement of moral blameworthiness").

For these reasons, Ms. Polston is likely to succeed on the merits of her Bill of Attainder claim.

**C. Summarily removing Ms. Polston from the Program under SB137 violates the Due Process Clause.**

"[T]he Due Process Clause shields from arbitrary or capricious deprivation those facets of a convicted criminal's existence that qualify as liberty interests." *Harper*, 64 F.3d at 564. Here, Ms. Polston is likely to succeed on her Due Process Clause claim because Defendant seeks to wield SB137 to return Ms. Polston to prison without any notice or opportunity to be heard. *See Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011).

The Tenth Circuit applies a two-step inquiry to determine whether an individual is denied due process: "(1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (quoting *Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073,

1078 (10th Cir. 2011)). Applying that test, automatically removing Ms. Polston from the Program and reincarcerating her violates the Due Process Clause.

**1. Ms. Polston possesses protected liberty interests she has by being in the Program.**

First, the Program invests Ms. Polston with protected liberty interests. Indeed, the Program is functionally equivalent to those provided by Oklahoma's Pre-parole Conditional Supervision Program at issue in the Tenth Circuit's and Supreme Court's decisions in *Harper*, which those courts held granted persons a protected liberty interest. In *Harper*, the program created "a penal status similar to, although more restrictive than, parole that allow[ed] convicts to live and work in society." 64 F.3d at 564. "Although remaining in the 'constructive custody' of the Department of Corrections, those in the [Pre-parole] Program work[ed] and reside[d] beyond the confines of a state penal institution and [we]re thus free to enjoy most of the benefits of a normal existence." *Id.* at 565. Mr. Harper was "removed from the Program because he was denied parole, [even though] nothing in the regulations governing the Program mandated that result." *Id.* at 565. Mr. Harper alleged that his removal without any process at all constituted a violation of due process, and the Tenth Circuit agreed.

Under the Program at issue here, eligible prisoners within ODOC are placed "in a community setting," with ODOC "satisfy[ing] its custody duties and responsibilities" through electronic GPS monitoring and "active supervision of the inmate in a community setting by a correctional officer or other employee of" ODOC. 57 O.S. §§ 510.9(A), (E). Thus, like Mr. Harper's participation in the Pre-Parole program, Ms. Polston's "passage outside the walls of a prison does not simply alter the degree of confinement; rather, it works a fundamental change in

the kind of confinement, a transformation that signals the existence of an inherent liberty interest and necessitates the full panoply of procedural protections." *Harper*, 64 F.3d at 566; *see Boutwell v. Keating*, 399 F.3d 1203, 1212 (10th Cir. 2005) (explaining that "a liberty interest inherent in the Due Process Clause arises upon an inmate's release from confinement" into a diversionary program). Ms. Polston currently lives in her own home, has "the freedom to 'be gainfully employed,' 'to be with family and friends,' and 'to form the other enduring attachments of normal life.'" *Harper*, 64 F.3d at 566 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)).

True, Ms. Polston must wear a GPS ankle monitor. Verified Complaint, ¶ 40. But this allows her greater liberty because she does not have to report to her probation officer as frequently as Mr. Harper did. *See Harper*, 520 U.S. at 149-50 (noting that Harper had "to report to his parole officer weekly and to provide the officer with a weekly itinerary"). Ms. Polston's supervising officer makes a house visit once per month, and Ms. Polston reports to the probation office once a month for a urine analysis. Verified Complaint, ¶ 44. This renders her no "more 'in custody' than a parolee, who was required to make similar visits." *See Harper*, 520 U.S. at 150 (stating "[w]e are at a loss to explain" how the weekly visits gave Mr. Harper less of a liberty interest than a parolee).

Ms. Polston has a curfew from 7:00 p.m. to 7:00 a.m. But during those hours, she can come and go as she pleases within the State. Verified Complaint, ¶ 84. She can attend church and her children's field trips, dance recitals, and extracurricular activities. She can attend her near-daily Alcoholics Anonymous meetings and volunteer at the food pantry, where she regularly prepares and serves meals.

In *Harper*, ODOC—as it will likely do in this case—argued that pre-parole was "merely a change in the degree or situs of an inmate's confinement" and thus the "revocation of such participation does not warrant the extensive procedural protections mandated by *Morrissey*." *Harper*, 64 F.3d at 565-66. The Tenth Circuit squarely rejected that argument. *Id.* at 566-67. And Justice Thomas, writing for a unanimous Supreme Court, agreed. *Harper*, 520 U.S. at 147-52. The Court held that given the nature of the liberty that Mr. Harper enjoyed on the pre-parole program, his "release was equivalent to parole as understood in *Morrissey*." *Id.* at 147. It recounted the essential nature of the liberty that was recognized in *Morrissey*:

> In *Morrissey*, we described the "nature of the interest of the parolee in his continued liberty":
>
> "[H]e can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. . . . The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions."

*Id.* (quoting *Morrissey*, 408 U.S. at 482). And comparing that with the liberty Mr. Harper enjoyed on the pre-parole program, the Court concluded: "This passage could just as easily have applied to respondent while he was on preparole." *Id.* And it could just as easily be applied to the Program in which Ms. Polston is enrolled. Thus, in reaching its conclusion that the nature of the liberties of the pre-parole program made it "equivalent to parole," the Supreme Court rejected the Oklahoma Court of Criminal Appeals' conclusion that the pre-parole program was simply a lesser "degree of confinement." *Id.* at 146-47.

Nonetheless, the Oklahoma Court of Criminal Appeals repeated its mistake just three months after the Supreme Court's decision in *Harper*. *See Fields v. Driesel*, 1997 OK CR 33, ¶¶ 26-28, 941 P.2d 1000, 1006. The Court of Criminal Appeals concluded that the Electronic Monitoring Program was similar to the pre-parole program and, without citing *Harper*, concluded that neither program was the "equivalent of parole" but just affected the "'degree' of confinement." *Id.* ¶¶ 26-27. That decision is irreconcilable with *Harper*.

Regardless, in reaching its decision that conflicted with *Harper*, the Court of Criminal Appeals relied on language in § 510.10 that has since been repealed. *Id.* ¶ 28. At that time, § 510.10 stated, "The electronic monitoring of an inmate pursuant to this section shall be in addition to active supervision required by law and shall be considered a level of security and confinement for the inmate within the assigned program." 57 O.S. § 510.10 (1996). A month after the court quoted this language, however, the Legislature repealed that language from the statute. *See* 1997 Okla. Sess. Laws ch. 133, § 31 (HB 1213), amending 57 O.S. § 510.10 (1996). That language does not appear in § 510.10 as it exists today nor when Ms. Polston was convicted or released into the Program. 57 O.S. § 510.10 (2021). And in any event, whether a participant in a community confinement program is classified as "in custody" or not was irrelevant to the due process analysis in *Harper*. *See Harper*, 520 U.S. at 150. What mattered was "the 'nature of the interest of the [participant] in his continued liberty.'" *Id.* at 147 (quoting *Morrissey*, 408 U.S. at 482).

In light of the significant degree of liberty that Ms. Polston enjoys on the Program, she has a liberty interest that is protected from "arbitrary or capricious deprivation." *See Harper*, 64 F.3d at 564.

**2. Automatic removal of Ms. Polston from the Program denies the process required by the Due Process Clause.**

Applying SB137 to automatically remove Ms. Polston from the Program would not provide her "an appropriate level of process" required by the Due Process Clause. *See Montoya*, 662 F.3d at 1167. Under *Harper*, the appropriate level of process is clear: "the full panoply of procedural protections outlined in *Morrissey*." *Harper*, 64 F.3d at 566 (citing *Morrissey*, 408 U.S. at 481-84).

At minimum, Ms. Polston is entitled to written notice of a claimed violation; disclosure of evidence against her; opportunity to be heard in person by a "'neutral and detached' hearing body"; to present witnesses and evidence; to confront the witnesses against her; and to receive a written decision reflecting the facts and reasons for removal. *See id.* (quoting *Morrissey*, 408 U.S. at 489). Summarily removing Ms. Polston from the Program under SB137 gives her "almost no process at all." *Harper*, 64 F.3d at 567. Doing so would be the equivalent of the deficient process that ODOC gave to Mr. Harper, who received a phone call at 5:30 a.m. requiring him to report to his probation office by 10:00 a.m. and was taken straight to prison. *Id.* Ms. Polston is therefore likely to succeed on the merits of her Due Process Clause claim.

**II. Absent a preliminary injunction, Ms. Polston will suffer irreparable harm.**

If this Court does not issue the requested preliminary injunction, Ms. Polston will be returned to prison in violation of her constitutional rights, an injury for which there is no remedy. "The second preliminary-injunction factor asks whether irreparable injury will befall the movants without an injunction. Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury." *Free the Nipple-Fort Collins v. City of Fort Collins*,

*Colo.*, 916 F.3d 792, 805 (10th Cir. 2019); *see Ortega v. Grisham*, 148 F.4th 1134, 1142 (10th Cir. 2025) ("When a plaintiff is asserting an injury in the form of a violated constitutional right, we presume that the injury will be irreparable if it exists."). The "deprivation of a constitutional right is a prototypical irreparable injury." *AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266, 1281 (W.D. Okla. 2025). And "[d]eprivation of physical liberty by detention constitutes irreparable harm." *Arevalo v. Hennessy*, 882 F.3d 763, 766-67 (9th Cir. 2018); *see Betschart v. Oregon*, 103 F.4th 607, 617 (9th Cir. 2024) (same).

Money cannot replace the time Ms. Polston will lose with her family if SB137 is retroactively applied to her. And the State of Oklahoma is "immune from suit for retrospective relief" so this Court could not award her monetary damages anyway. *Chamber of Com. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010). When monetary damages are barred by sovereign immunity, that alone "constitutes irreparable injury." *Id.* This factor thus decisively weighs in favor of a preliminary injunction.

**III. Both the balance of equities and public interest favor granting this injunction.**

The balance of equities and the public interest also weigh in favor of granting Ms. Polston's motion. When, as here, the "'Government is the opposing party,'" the "third and fourth [preliminary injunction] factors 'merge.'" *Shaw v. Smith*, 166 F.4th 61, 78 (10th Cir. 2026) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And "where a law is likely unconstitutional, the interests of the government 'do not outweigh' the plaintiff's rights to have its constitutional rights protected." *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1188 (D. Colo. 2023) (first quoting *Nken*, 556 U.S. at 435, then quoting *Awad*, 670 F.3d at 1131).

The balance of equities tips decisively in Ms. Polston's favor as her interest in remaining with her family and out of prison greatly outweighs any burden that

the preliminary injunction might place on the Defendant by maintaining the status quo. *See Ortega*, 148 F.4th at 1142. ODOC, pursuant to state law, placed Ms. Polston in the Program. Rather than pose any further threat to the public, she has thrived in the Program, continuing to attend AA meetings and to otherwise commit to her own rehabilitation. Aside from a desire to punish an unpopular individual, the State cannot offer any equitable interest to offset Ms. Polston's interests. And "[w]hen a constitutional right hangs in the balance, . . . 'even a temporary loss' usually trumps any harm to the defendant." *Free the Nipple*, 916 F.3d at 806 (quoting 11A Wright & Miller's Fed. Prac. & Proc. § 2948.2 & n.10 (3d ed. 2018)).

Finally, it is black-letter law that "the state can have no interest in keeping an unconstitutional law on the books." *Ortega*, 148 F.4th at 1154 n.13 (citation omitted). And "'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Awad*, 670 F.3d at 1132 (quoting *Awad v. Ziriax*, 754 F. Supp. 2d 1298, 1308 (W.D. Okla. 2010)). The "'public has a more profound and long-term interest in upholding an individual's constitutional rights'" even than the public's interest in fulfilling the will of the voters. *Id.* (quoting *Awad*, 754 F. Supp. 2d at 1308). Finally, Ms. Polston seeks merely to preserve the status quo while this Court considers her case, so she need not make the "stronger showing" for a preliminary injunction that *alters* the status quo. *See Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016).

## CONCLUSION

For the foregoing reasons, this Court should preliminarily enjoin Defendant from summarily removing Ms. Polston from the Program to reincarcerate her while this litigation is pending. Plaintiff asks that this injunction issue *before* SB137 takes effect on November 1, 2026.

Dated: August 28, 2026

Respectfully submitted,

/s/ *Mithun Mansinghani*
Mithun Mansinghani
LEHOTSKY COHN LLP
629 W. Main St.
Oklahoma City, OK 73102
Telephone: (512) 693-8350
mithun@lehotskycohn.com

Mark Rothrock
LEHOTSKY COHN LLP
8513 Caldbeck Dr.
Raleigh, NC 17615
Telephone: (512) 693-8350
mark@lehotskycohn.com

Jonathan DeWitt*
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW
Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
jdewitt@lehotskycohn.com

**admission pending*

*Counsel for Plaintiff Sara Polston*

## CERTIFICATE OF SERVICE

I, Mithun Mansinghani, certify that on August 28, 2026, the foregoing was served by hand-delivery to the opposing party and the Office of the Oklahoma Attorney General.

*/s/ Mithun Mansinghani*
Mithun Mansinghani