# Exhibit 1.3

**IN THE SUPREME COURT OF THE STATE OF OKLAHOMA**
**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**

| | | |
|---|---|---|
| **IN RE: MULTICOUNTY GRAND JURY, STATE OF OKLAHOMA** | ) ) | **Case No. SCAD-2024-83** **D.C. Case No. GJ-2024-3** |

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

MAY 0 8 2026

RICK WARREN
COURT CLERK
06____________

## REPORT OF INVESTIGATION

## FINDINGS OF THE TWENTY-FIRST MULTICOUNTY GRAND JURY REGARDING THE OKLAHOMA DEPARTMENT OF CORRECTIONS ELECTRONIC MONITORING PROGRAM

**May 7, 2026**

# Contents

Introduction ........ 1
The Case of Sara Polston ........ 2
  The Crime ........ 2
  Sentencing ........ 3
  Cleveland County Jail ........ 5
  Cleveland County Jail Calls ........ 5
  Expedited Transport to DOC ........ 7
  Sara Polston's Transfer to GPS Program ........ 8
Department of Corrections Electronic Monitoring Program ........ 9
  Statutory Authority ........ 9
  The GPS Process ........ 9
  Sara Polston's GPS Approval ........ 10
  Other GPS Program Concerns ........ 11
  Governor J. Kevin Stitt's Influence ........ 12
Conclusions and Recommendations ........ 13

# Introduction

On February 7, 2023, while driving under the influence of alcohol, Sara Polston caused a vehicular collision resulting in grievous, life-changing injuries to 20-year-old Micaela Borrego. Sara Polston's blood alcohol level was 0.158. On June 14, 2023, Sara Polston was charged with one felony count of Causing an Accident Resulting in Great Bodily Injury While Driving Under the Influence of Alcohol with a Blood Alcohol Content of 0.15 or Higher in Cleveland County Case No. CF-2023-973. On December 5, 2025, Sara Polston was sentenced to a fifteen (15) year split sentence - eight (8) years in prison followed by seven (7) years on probation. On February 19, 2026, after spending 73 days in prison, Sara Polston went home. Sara Polston was released pursuant to the Oklahoma Department of Corrections (DOC) Electronic Monitoring Program (GPS Program).

Over the past two months, the Twenty-First Multicounty Grand Jury of Oklahoma received evidence, including witness testimony, documentary evidence, and audio and video evidence, relating to DOC's GPS Program and the case of Sara Polston. We heard testimony from Oklahoma DOC personnel and other individuals who had personal knowledge of Sara Polston's case and release and of the GPS Program inner workings. Delving beyond the media reports detailing *what* happened, this Grand Jury set out to investigate *how* and *why* Sara Polston served only 73 days of an 8-year prison sentence. The evidence showed not only serious pitfalls surrounding the GPS Program but also troubling instances of favoritism within DOC and the Cleveland County Jail.

Although our investigation uncovered deeply concerning practices and actions (and inactions) by government officials and employees, we ultimately find insufficient evidence exists to establish that a crime was committed.[1] Nor do we find *willful* or *corrupt* misconduct or *willful* malfeasance of any public officer. Nevertheless, we find the current state of the DOC GPS Program indefensible and the instances of political favoritism reprehensible. Citizens deserve an even playing field irrespective of wealth, social status, and political connections. This report is

[1] Unlike federal grand juries, and those of many other states, where the burden of proof for an indictment is "probable cause", Oklahoma Statutes provide that, "The grand jury ought to find an indictment when all the evidence before them, taken together, is such as in their judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury." 22 O.S.2021 § 336. The burden of proof to warrant a conviction by a trial jury is "beyond a reasonable doubt". *See In re Winship*, 397 U.S. 358 (1970), 90 S.Ct. 1068; *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078 (1993); and OUJI CR2d 1-8 ("The defendant(s) is/are presumed innocent of the crime(s) and the presumption continues unless after consideration of all the evidence you are convinced of his/her guilt beyond a reasonable doubt."

intended to shine a light on the systemic GPS Program failures we identified and to make recommendations to protect against such failures in the future.

After careful consideration of all the evidence, the Multicounty Grand Jury hereby submits to this Honorable Court and to the People of the State of Oklahoma the following report of its findings and recommendations.[2]

## The Case of Sara Polston

### The Crime

On February 7, 2023, 20-year-old Micaela Borrego was driving in Norman, Oklahoma after leaving her job at a local restaurant. Micaela spoke to her dad on the phone that morning expressing her excitement about an upcoming trip to the Wichita Mountains for a weekend of hiking with friends. Micaela was never able to attend that trip.

On the same day, Sara Polston was due to pick up her children from school at 3:00 p.m. in Norman, Oklahoma. At 2:53 p.m., on the way to her children's school, Polston stopped at Cellar Wine and Spirits where she purchased a 750ml bottle of Cincoro Blanco Tequila. After purchasing a bottle of tequila, Polston drove toward her children's school.

Doorbell camera video footage showed Polston driving at high speeds on North Lahoma Ave and driving through residential intersections with no regard for at least four stop signs. After speeding through a stop sign at the intersection of North Lahoma Ave and West Acres Street, Polston collided into Micaela Borrego's vehicle. Micaela's car was launched off the road and collided into the outer brick wall of a house. Micaela's passenger side car door was crushed into the center console. Polston's vehicle data revealed she was driving at 66 mph four seconds prior to impact. The speed limit was 25 mph.

---

[2] This report is submitted pursuant to 22 O.S.2021, 346, which provides:

> In addition to any indictments or accusations that may be returned, the grand jury, in their discretion, may make formal written reports as to the condition and operation of any public office or public institution investigated by them. No such report shall charge any public officer, or other person with willful misconduct or malfeasance, nor reflect on the management of any public office as being willful and corrupt misconduct. It being the intent of this section to preserve to every person the right to meet his accusers in a court of competent jurisdiction and be heard, in open court, in his defense.

Officers arrived to find Micaela Borrego convulsing and nonresponsive in her vehicle. She was transported to OU Medical and admitted to the ICU where she was determined to be in critical condition and unable to breathe on her own. Micaela's mother was first notified about the car wreck by the resident pastor at OU. She was contacted by the pastor, instead of medical professionals, because there was a serious belief that Micaela would not survive. Krista arrived to find Micaela in the ER, unable to breathe, and involuntarily convulsing. Medical professionals initially gave Micaela a 5% chance of survival.

Despite wearing a seatbelt at the time of the collision, Micaela suffered permanent life-changing injuries including brain swelling, a sacrum fracture, a lumbar spine fracture, dislocation of her tailbone area, bleeding around her brain, scalp lacerations, eyelid lacerations, vertebral artery injuries, cerebral artery injuries, and carotid artery injuries. Micaela spent two months in a coma and suffered a stroke due to her injuries, potentially shortening her life expectancy by ten years. At the time of the crash, she scored a 3 on the Glasgow Coma Scale, the lowest possible score, indicating a deep coma. She was eventually discharged to a rehabilitation facility with a traumatic brain injury diagnosis.[3]

At the collision scene, officers found Sara Polston sitting on the ground outside of her car. Her speech was thick and slurred. Officers would later discover the bottle of tequila in Polston's vehicle uncorked and empty. When interviewed by officers, Polston denied having consumed any alcohol but admitted to ingesting a 50mg marijuana edible the night before. Polston made no mention of her trip to a liquor store just minutes prior to the collision. Polston later admitted to drinking margaritas at lunch with a group of women before getting behind the wheel that day. The results of a blood test showed Polston had a blood alcohol content of 0.158, almost double the legal limit. Polston also had marijuana in her system.

## Sentencing

On June 14, 2023, Sara Polston was charged with one felony count of Causing an Accident Resulting in Great Bodily Injury While Driving Under the Influence of Alcohol with a Blood Alcohol Content of 0.15 or Higher in Cleveland County Case No. CF-2023-973. On October 1, 2025, Polston entered a blind plea of guilty and

---

[3] Contemporaneous with this report, we, the Grand Jury, release for public review select videos depicting Micaela Borrego before the car wreck, at the collision scene, and after the car wreck. We release these videos with the permission of the Borrego family. We do so to display the gravity of the injuries Ms. Borrego sustained. A factor never considered by DOC officials prior to Ms. Polston's release.

sentencing was continued to December 5, 2025. The Honorable Judge Leah Edwards ordered the Oklahoma Department of Corrections to conduct a Pre-Sentence Investigation (PSI) in anticipation of sentencing.

Shortly after, the interim DOC Director, Justin Farris, received a call from the Governor's Office. That conversation was initially discussing Farris' appointment to the role of interim DOC Director and his impending Senate confirmation. The conversation then shifted to the topic of Sara Polston who was at the time a pending criminal defendant not yet in the custody of DOC. The Governor's Office inquired about the PSI process for Sara Polston.

The DOC officer assigned to conduct the PSI initially contacted Sara Polston. Within two hours of contacting Polston, the PSI officer was called by a superior DOC employee, Bo Ranells. Ranells informed the PSI officer that the Governor's office had called DOC Director Farris regarding Sara Polston. The PSI Officer was instructed to be kind, professional, and respectful to Sara Polston in conducting the PSI.

The PSI Officer was shortly thereafter called into his direct supervisor's office. The Direct Supervisor stated he was informed by DOC executives that Sara Polston feels like law enforcement doesn't like her and any DOC employees involved in the PSI were to ensure Polston was treated with respect and made to feel comfortable. The Direct Supervisor reiterated that this was a result of DOC Director Farris receiving a call from the Governor's office. The PSI Officer was not explicitly instructed to be lenient in his sentencing recommendation to the court; however, he believed that the message carried an implication that he was to be lenient. He felt that the wrong decision could cost him his job. After compiling all necessary information for the PSI, he ultimately recommended that the court sentence Polston to a term of prison.

Prior to sentencing, the Borrego family reached a monetary settlement with the Polstons in a civil lawsuit. A significant amount of the settlement went to the Borregos' attorney fees. The remainder is being used to pay for the care Micaela will need for the rest of her life. The entirety of the settlement was paid by the Polstons' insurance company. Civil attorneys for the Polstons presented the Borregos with a conditional offer stating the Polstons would pay $500,000.00 out of their own pocket to the Borregos if Sara Polston was not sentenced to prison. Unswayed by this offer, the Borregos requested that the court sentence Sara Polston to a term of prison. On December 5, 2025, Judge Edwards sentenced Sara Polston

to 15 years with the first 8 years to be served in prison. At the sentencing hearing, Sara Polston admitted to an alcohol relapse during the pendency of her criminal case.[4]

## Cleveland County Jail

After sentencing, Sara Polston was remanded to the custody of the Cleveland County Sheriff to await transport to prison. Rod Polston - attorney, owner of Polston Tax Firm in Norman, and husband of Sara Polston – spoke with Cleveland County Sheriff Chris Amason multiple times regarding his wife's custody in the Cleveland County Jail. At Rod Polston's request, Sheriff Amason had Sara Polston initially placed in a medical cell for her comfort and later had her moved to a different cell area because she wanted to be able to watch television. Sara Polston found that cell to be too loud, so Sheriff Amason had her moved back to her original cell at her husband's request. Sheriff Amason coordinated in person visitations for the Polstons at Rod Polston's request. On one occasion, Rod Polston brought his wife Chick-fil-a. She was also issued a tablet in a manner outside of normal procedure. These sorts of inmate accommodations were unprecedented in the Cleveland County Jail. The sheriff informed investigators that he wanted to help the Polstons. He stated he was trying to do Polston a favor and wanted to "do them a solid."

## Cleveland County Jail Calls

Recorded phone calls from the Cleveland County Jail[5] revealed that Rod Polston sought to use his connections with other government officials for his wife's benefit.[6] Knowing that their calls were being recorded, the Polstons often spoke in code to conceal the subjects of their conversations.[7] A common subject of conversation was a person the Polstons referred to as "The Guy", "Our Friend", and "Our Buddy."

- In the initial jail calls, Rod Polston tells his wife that "The Guy" is working on getting her moved out of Cleveland County Jail and that the head of DOC is "on top of it." Rod Polston goes on to state that "The Guy" is working on the "P word" however the "P word" must first go

---

[4] Sara Polston was out of custody on bail until her sentencing.

[5] Contemporaneous with this report, we, the Grand Jury, release select jail and DOC phone calls for public review. We do this in the interest of transparency to the public. Some calls have been redacted to preserve privacy interests of minor children.

[6] Sara Polston was unable to fully activate her jail call account, so all calls were limited to one minute.

[7] All Cleveland County Jail phone calls begin with an automated message stating that all phone calls are subject to recording and monitoring.

through the Pardon and Parole Board before "The Guy" approves it and the process is not like the President of the United States. Rod Polston states that "The Guy" was checking to see if the Pardon and Parole board serves "at his pleasure" to determine if he can tell the Board what to do. Sara Polston then asks her husband about "the ankle."

- In a jail call conversation regarding Sara Polston's sentencing hearing, Rod Polston states "'Our Friend' was not happy that the DA did not change their position. Was *not* happy at all." Rod Polston goes on to say "Our Friend" wanted to know if "she" (presumably the Cleveland County District Attorney) was there for sentencing.

- On Sunday, December 7, 2025, Rod Polston states that he is getting back into the political arena and implies he wants to garner the favor of Oklahoma Attorney General Candidate Jon Echols. It is important to note that on this same call, Rod Polston references a meeting with another person named "John." It is believed that "John" is in reference to John Cannon, Sara Polston's criminal defense attorney at the time. There was no evidence in this investigation indicating that Jon Echols played any role in Sara Polston's case.

- On December 7, 2025, Rod Polston states that he doesn't want to bother "Kevin", but that Rod would speak to him if Sara was not out of the Cleveland County Jail by Wednesday.

- On December 8, 2025, Rod Polston tells his wife that "Kevin" was going to give him an update. In another jail call that same day, Sara Polston states "we only have 'A Friend' for a year left."[8] Rod Polston states that "'Our Buddy' is going to do everything he can."

This investigation revealed that Rod Polston and Governor Stitt are believed to have attended the same high school and are members of the same college fraternity. Rod and Sara Polston have previously contributed $27,800 to Governor Stitt's campaigns. On September 28, 2022, the Polstons hosted a fundraiser at their home for Governor Stitt. An invitation for the event read "Donation Requests: $5,800 Couple All in for Gov. Stitt; $2,900 Individual All in for Gov. Stitt; $500

[8] At that time, Governor Stitt had approximately one year remaining in his final term in office.

Suggested Level to Attend." Taken in context, we conclude that "The Guy/Buddy/Friend" is a code word for Governor Kevin Stitt.

## Expedited Transport to DOC

After receiving a prison sentence, the average female inmate will remain in a county jail for 20-30 days before being transported to a DOC correctional facility. Sara Polston was in the Cleveland County jail for just over two days. Sara Polston's transport to DOC custody was expedited at the direction of DOC executives.

While Sara Polston was in the Cleveland County Jail, interim DOC Director Farris received another call regarding Polston's case – this time from the Governor himself. Shortly after, DOC executives contacted the Cleveland County District Attorney asking for her to prepare and send Sara Polston's Judgment and Sentence form as soon as possible.[9] DOC Chief of Operation, Jason Sparks ordered Chief of Population, Jason Bryant, to expedite Sara Polston's transport and have her picked up from the Cleveland County Jail.[10] Bryant then assigned two DOC officers to personally transport Sara Polston from Cleveland County to a DOC facility. When Sara Polston was picked up by her DOC personal escort, there were three other female inmates at the Cleveland County Jail awaiting transport to prison. None of them were transported with Polston. Bryant termed Sara Polston's case as "high profile" because of her husband.

Sara Polston was first transported to Mable Bassett Correctional Facility for processing.[11] The average female inmate will remain at Mable Bassett for two weeks before transfer to their final correctional facility.[12] Sara Polston remained at Mable Bassett for one day before being transferred to Dr. Eddie Warrior Correctional Center on December 9, 2025. It does not seem reasonable to believe that Sara Polston was adequately processed and assessed for in-house processing and assessment.

Prior to Sara Polston's transfer to DOC custody, Rod Polston told Sara Polston he had conversations with government officials regarding his wife's DOC facility

---

[9] Typically, DOC must receive an inmate's Judgment and Sentence form prior to transport.

[10] According to the DOC Chief of Population, inmate transfer from county jail to DOC custody is expedited at times due to health or behavioral issues. Polston had neither. The DOC Chief of Population could identify no other instance of an inmate transfer being expedited without any reason.

[11] Mable Bassett serves as the primary reception and assessment center for all females incarcerated in Oklahoma. All female inmates are assessed to determine facility assignment and what incarceration program criteria they meet. Female inmates will either stay at Mable Bassett or be assigned to Dr. Eddie Warrior Correctional Center.

[12] According to the Oklahoma DOC website, female inmates go through a "10-30 day assessment period" at Mable Bassett. https://oklahoma.gov/doc/facilities.html#accordion-408e288960-item-622331c413

placement. In multiple Cleveland County Jail calls on December 8, 2025, Rod Polston informed his wife that he advocated for her placement at Eddie Warrior after being told it was the best placement. Rod Polston stated that "'Our Friend' said if we need to move her, we'll move her." Rod Polston went on to tell his wife that Eddie Warrior was at 99% capacity so they can "justify bouncing you out earlier because they just don't have the space."

## Sara Polston's Transfer to GPS Program

On February 19, 2026, Sara Polston was assigned to the DOC GPS Program and transferred from the Dr. Eddie Warrior Correctional Facility to a monitoring program at her residence. Sara Polston served 73 days (approximately 2.5%) of an 8-year sentence in DOC custody.

Krista Borrego, Micaela's mother and now Micaela's primary full-time care giver, was not notified by DOC prior to Sara Polston's GPS approval. She was not given a chance to object. She was not provided with an opportunity to present evidence or testimony in opposition to Polston's release. DOC did not inquire about Micaela's current medical status, prognosis, or the extent of her lasting injuries.

Sara Polston's DOC phone calls indicated that her GPS approval was in the works for a while and the Polstons were confident the decision would not be overturned.[13] This Grand Jury asked several DOC executives, including those who played a decision-making role in Sara Polston's GPS approval, if they spoke with Krista or Micaela Borrego before or after Polston's release. These DOC executives gave a common response – "I don't know who that is."

Krista Borrego was notified by victim advocates at the Cleveland Couty District Attorney's Office of Sara Polston's *impending release date*. DOC's decision to release Sara Polston had already been made. The Cleveland County District Attorney's Office continued to advocate for the Borregos. The Cleveland County District Attorney vehemently objected to Polston's early release, despite there being no objection process in statute or DOC policy. DOC still forged ahead. The Cleveland County District Attorney's Office helped Krista Borrego send emails and letters of protest to DOC executives. No one from DOC ever responded to Krista.

[13] Inmate calls from DOC facilities also include an automated statement that calls are subject to recording and monitoring.

# Department of Corrections Electronic Monitoring Program

## Statutory Authority

Statutory authority for the DOC GPS Program permits certain inmates to be released[14] under GPS supervision prior to the completion of their prison sentence.[15] Inmates serving a sentence for a "violent" crime are ineligible for the GPS Program.[16] At the time, causing an Accident Resulting in Great Bodily Injury While Driving Under the Influence of Alcohol was not classified as a "violent" crime under Oklahoma law. Inmates convicted of a DUI crime who are not receptive to substance abuse treatment are ineligible for the GPS Program.[17] Sara Polston was not in prison long enough to participate in any DOC treatment programs.[18]

By state statute, inmates who are "serving a sentence of more than ten (10) years" are ineligible for the GPS Program.[19] Despite Sara Polston receiving a total sentence of 15 years (8 years in prison followed by 7 years of probation), DOC has historically self-determined that the 10-year sentence limit for eligibility applies only to the prison portion of a sentence and not the sentence as a whole.

The GPS Program statutes are silent regarding the minimum time an inmate must serve in prison before GPS release. In another act of self-determination, DOC has filled that gap with a simple answer – 30 days. Pursuant to DOC's self-dictated policy and procedure, inmates who meet the statutory eligibility for the GPS Program need only serve a minimum of 30 days in DOC custody before GPS approval. This 30-day minimum begins from the day an inmate is transferred to DOC custody. Time spent in a county jail awaiting transport to DOC does not count. Sara Polston's GPS application clock started just a few days after her sentencing thanks to DOC's expedited private transport.

## The GPS Process

Inquiry into the workings of the GPS Program revealed the vetting and approval process to be shockingly mechanical and unilateral at best, and at worst, unprincipled and callous. For female inmates, the GPS process begins during

---

[14] DOC considers individuals on the GPS Program to still be "in custody" of DOC.
[15] 57 O.S. 510.9 *et seq.*
[16] "Violent" crimes are categorized in 57 O.S. 571.
[17] 57 O.S. 510.9(B)(3)
[18] Although evidence was received that Sara Polston did participate in DOC exercise programs.
[19] 57 O.S. 510.9(B)(1)

reception and assessment at Mable Bassett. If an inmate is statutorily eligible for the GPS Program, a case manager investigates if the inmate would have a suitable place of residence and employment upon release. The case manager then notifies the Administrative Programs Officer (APO) of the DOC Population Division. From there, the APO reviews the documents in DOC's case management software system and determines if the inmate should be recommended for GPS release. DOC has one APO. One person is charged with reviewing and approving all GPS Program applications for the entire state. After the APO recommends approval or denial of a GPS application, his decision is subject to two levels of review – the DOC Population Coordinator (the APO's direct supervisor) and then the Chief of Population, Jason Bryant.[20]

## Sara Polston's GPS Approval

While Sara Polston was in custody at Eddie Warrior, interim DOC Director Farris received a second call from the Governor, this time asking to confirm Polston was being released on GPS. Interim Director Farris later confirmed that Jason Bryant had approved Sara Polston's GPS release. Interim Director Farris informed this Grand Jury that he could have overridden Bryant's decision and denied Polston's release after 73 days, but he did not. Bryant also notified DOC Chief of Operations Jason Sparks. Sparks also informed this Grand Jury that he could have overridden Bryant's decision, but he did not. The PSI, previously prepared by DOC recommending a prison sentence for Sara Polston, was not reviewed by *any* DOC decision-makers before granting Polston's GPS release.

Oklahoma statute for the GPS program states, "the Director of the Department of Corrections *may* assign the inmate, if eligible, to the Electronic Monitoring Program."[21] Several DOC executives claimed their hands were tied by statute and policy in approving Polston's early release, however, all affirmed that the GPS Program is discretionary and that they possessed the ability to deny Polston's application at the time. Interim DOC Director Farris possesses so much discretion that he claimed that if the Governor had explicitly commanded him to release Sara Polston on GPS as soon as possible, he would have ensured her release on day number 31 of her incarceration. Despite Sara Polston's statutory eligibility, her release on GPS was still *entirely* subject to DOC discretion, was *not* mandatory, and did *not* and should not have occurred in 73 days.

---

[20] The APO's direct supervisor was on vacation at the time of Sara Polston's application. Her GPS application was reviewed only by the APO and DOC Chief of Population.

[21] 57 O.S. 510.9(B)

## Other GPS Program Concerns

Throughout this process there are no judicial or administrative hearings and there is no board of officials that review and vote on an application. The inmate is not brought before the judge that sentenced him or her. Statute and DOC policy not only lack any proceedings for a victim to object or be heard, but it is also completely devoid of any victim notice requirement prior to an inmate's approval. While statute requires that DOC notify the district attorney and chief law enforcement officers prior to an inmate's placement in their county, statute only requires that DOC communicate an inmate's impending release date to a third-party victim notification service provider.

Concerns with the GPS Program do not stop at policies and procedures. The role of DOC APO – the individual who has the initial review on whether someone is granted early transfer from prison on GPS – is severely unregulated. There are no specific qualifications required to be an APO. While judges who are often charged with determining a defendant's fate are bound by an ethics code, the role of APO has no ethical guidelines whatsoever. While juries are meticulously instructed about what they are allowed to consider and to ignore outside influences so as to ensure impartiality, the role of APO is left with unfettered discretion to consider anything they deem important. The APO and Population Chief at the time of Sara Polston's incarceration admitted to often using Google searches and reviewing media reports to aid in decision-making. DOC has no conflict-of-interest safeguards for these decision-makers, a deficiency that at times has led to APOs reviewing and making decisions regarding inmates that they personally know. Multiple DOC employees involved in Sara Polston's case were contacted by her attorney who advocated on her behalf. Testimony presented to this Grand Jury revealed that this was an unprecedented contact by an attorney. No such opportunity for advocacy was given to the Borregos or the Cleveland County District Attorney.

For comparison, Oklahoma's process for pardon and parole must follow a detailed and comprehensive statutory framework.[22] Decisions and recommendations for inmate parole must be determined by a vote of an appointed board, the members of which must have years of experience in relevant fields. These Pardon and Parole Board members are required to receive hours of training every year on matters relating to their duties. They are required by law to adhere to standards of impartiality, independence, integrity, and fairness. Oklahoma statutes require

[22] 57 O.S. 332 *et seq.*

disclosure and recusal when conflicts of interest arise. Statute provides for hearings and proceedings that are transparent to the public. District attorneys and/or victims must be given ample notice and opportunity to object and be heard on matters of parole. The GPS Program statutes and policy are virtually devoid of these characteristics.

## Governor J. Kevin Stitt's Influence

The evidence demonstrated that Governor J. Kevin Stitt is a close personal friend of Rod and Sara Polston - a fact he explicitly stated to the Cleveland County District Attorney, Jennifer Austin. District Attorney Austin admirably refused to afford special treatment to Sara Polston despite being appointed to office by Governor Stitt. The same cannot be said for some DOC Officials.

Governor Stitt made multiple calls to DOC Interim Director Justin Farris on behalf of the Polstons. On at least one other occasion the Governor's Chief of Staff, Donnell Harder, called interim Director Farris inquiring about Sara Polston even before she was sentenced to prison.

The evidence established that Sara Polston's remarkably swift transfer from the Cleveland County Jail to DOC, was done without a Judgment and Sentence in violation of DOC policy, was orchestrated by DOC officials.

The evidence surrounding Sara Polston's transfer from DOC to the GPS program after serving only 73 days of an eight-year sentence was more opaque. While no witness testified that they were directed by the Governor to release Sara Polston from prison, it defies common sense and logic to believe that the Governor and Governor's staff's multiple phone calls to newly appointed Interim Director Farris did not play a role in the remarkable decision to release Sara Polston just over two months into an eight year sentence for DUI – Great Bodily Injury.

Evidence was also received that when district attorneys object to an inmate's transfer on the GPS program sometimes DOC reconsiders. The interim DOC Director and his staff's refusal to do so in this instance despite the district attorney's objection and a public outcry further bolster this Grand Jury's conclusion that the DOC Director and his staff believed that facilitating Sara Polston's early transfer would please their boss, the Governor. Further confirming this conclusion is evidence that interim DOC Director Farris told others that he was, "in a tight spot," an apparent reference that he wanted to stay in Governor Stitt's good graces by transferring Sara Polston, but also not anger state senators who would be voting on

his confirmation as DOC Director. This rank political favoritism, particularly on a crime that nearly took the life of a 20-year old young woman, is indefensible.

## Conclusions and Recommendations

Micaela Borrego is now 23 years old. Prior to the car wreck, she was a vibrant 20-year-old. She was attending college at Rose State and was studying to be an ultrasound technician. Micaela loved cooking and horseback riding. After the crash caused by Sara Polston's crime, Micaela had to relearn how to eat, how to walk, and how to talk. Krista Borrego witnessed her daughter learn how to say the word "mom" again at the age of 21. Sara Polston spent 73 days in DOC custody. Micaela Borrego spent almost an equal amount of time in a coma. After almost losing a daughter to a drunk driver, the Borregos were victimized again by DOC and its policies.

The Multicounty Grand Jury commends the Legislature on the passing of Senate Bill 137.[23] Still, the DOC GPS Program, in its current state, reduces the criminal justice system to a purely administrative exercise that subverts the decisions of judges and stifles the voices of victims. The fact that the Borrego family was not consulted prior to Sara Polston's GPS approval is reprehensible. The manner in which Krista Borrego learned of Sara Polston's already determined release is abhorrent.

To ensure the systematic failures are not repeated in the future, the Multicounty Grand Jury makes the following recommendations:

1. The Legislature should enact legislation (1) requiring an inmate to serve a minimum percentage of their prison sentence prior to transfer to GPS, (2) requiring DOC to *directly* notify any victim and the District Attorney from the sentencing jurisdiction of an inmate's pending GPS application *prior* to its approval, (3) requiring DOC to provide any victim and the District Attorney from the sentencing jurisdiction with an opportunity to be heard on matters related to a pending GPS application *prior* to its approval, (4) requiring GPS transfer to be

[23] SB137 adds the crime of Causing an Accident Resulting in Great Bodily Injury While Driving Under the Influence a disqualifying crime for the GPS Program. SB137 became law *without the Governor's signature* on May 5, 2026.

approved by board or committee, and (5) requiring any individual convicted of a DUI-related crime and sentenced to prison to complete mandatory in-custody rehabilitation programs prior to release or transfer to GPS.

2. The Oklahoma Department of Corrections should revise its internal policies and procedures to ensure that victims are consulted and provided an opportunity to be heard prior to decisions of inmate transfer to GPS, similar to practices observed in the pardon and parole process. The Multicounty Grand Jury commends the Cleveland County District Attorney's Office for its continued victim advocacy and hopes the Department of Corrections will similarly seek to give victims a voice in the future. DOC should amend its policies requiring any inmate currently sentenced for Causing an Accident Resulting in Great Bodily Injury While Driving Under the Influence on the GPS Program to be immediately returned to traditional DOC custody.

3. The State should establish training programs for DOC employees charged with decision-making on matters related to inmate early release that encompasses ethical considerations, victim rights, and conflicts of interest.

4. The Legislature should limit the discretion afforded to DOC administrators on programs that release or transfer offenders from traditional incarceration prior to the completion of their sentence. Unfortunately, DOC's decision to transfer Sara Polston to an in-home GPS monitoring program after serving only 73 days of an eight-year sentence for a crime that forever impacted Micaela Borrego and her family unequivocally demonstrate how easily political influence can affect the exercise of those officials' discretion.

[redacted]

Twenty-First Multicounty Grand Jury

**ORDER**

This *Report of Investigation* of the Twenty-First Multicounty Grand Jury is hereby received and submitted this 7 day of May, 2026.

NATALIE MAI, DISTRICT JUDGE
Presiding Judge of the
Multicounty Grand Jury

CERTIFIED COPY
AS FILED OF RECORD
IN DISTRICT COURT
MAY 0 8 2026
RICK WARREN COURT CLERK Oklahoma County